POLKOW v CITIZENS INSURANCE COMPANY OF AMERICA

Docket No. 87617. Argued January 10, 1991 (Calendar No. 10). Decided August 26, 1991. Rehearing denied 439 Mich 1202.

Robert Polkow, doing business as Polkow Oiling Service, brought an action in the Ingham Circuit Court against Citizens Insurance Company of America, alleging duties under a policy of liability insurance to defend him against charges by the Department of Natural Resources and the Environmental Protection Agency of groundwater contamination, and to indemnify him for the cost of undertaking a study, as requested by the DNR, to identify the source of the contamination. The court, James T. Kallman, J., granted summary disposition for the plaintiff, finding both a duty to defend and a duty to indemnify the costs incurred in responding to governmental inquiries. The Court of Appeals, D. E. HOLBROOK, JR., P.J., and SAWYER and NEFF, JJ., affirmed in an opinion per curiam (Docket No. 108437). The defendant appeals.

In an opinion by Chief Justice CAVANAGH, joined by Justices LEVIN, BRICKLEY, and BOYLE, the Supreme Court held:

Summary disposition was inappropriate. The circuit court resolved the factual disputes itself, depriving the parties of the right to an evidentiary hearing.

1. Factual disputes regarding the cause of the contamination remain. Given the state of the factual development, resolution of whether the sudden and accidental exception to the policy's pollution-exclusion clause applies is impossible.

2. Under the insurance contract, the insurer had a duty to defend against any claim where coverage was even arguable. Fairness requires that there be a duty to defend at least until there is sufficient factual development to determine what caused the pollution so that a determination can be made regarding whether the discharge was sudden and accidental. Until that time, the allegations must be seen as arguably within the comprehensive liability policy, resulting in a duty to defend.

3. Without proof of the source of the discharge, the court cannot determine whether the discharge falls within the pollution-exclusion clause or whether the unknown discharge falls

within the sudden and accidental exception to the exclusion clause. Because this uncertainty creates doubt regarding coverage, summary disposition was inappropriate, requiring reversal of the grant and remand for factual determinations.

Reversed and remanded.

Justice RILEY, joined by Justices GRIFFIN and MALLETT, dissenting, stated that neither the routine release of toxic materials over a period of years nor the gradual leakage of an underground tank containing the materials can be considered sudden and accidental events, so as to preclude application of the pollution exclusion of the defendant's policy. Thus, coverage should be barred for any release that occurred on the plaintiff's property, and the defendant should have no duty to indemnify.

The duty to defend is broader than the duty to indemnify and is properly invoked when claims are even arguably within coverage. To determine whether coverage exists, it is necessary to focus on the basis of the injury, not the nomenclature of the underlying claim. Any doubt pertaining to the duty to defend is resolved in favor of the insured. Thus, only if there is a possibility of coverage on the basis of the underlying facts is there a duty to defend. Generally, policy language that is ambiguous is construed in favor of the insured. Unless a term is clearly defined in a policy, its meaning will be in accordance with the common usage of the term. Ambiguity should not be created where none exists, nor should a policy be rewritten under the guise of interpretation.

The pollution exclusion of the policy at issue bars recovery unless the release of toxins is sudden and accidental. The proper focus is not whether the contamination or damage is sudden and accidental, but whether the release is sudden and accidental. Clearly, the definition of "occurrence" is not intended to be coterminous with a sudden and accidental release.

The phrase "sudden and accidental" is plain and unambiguous. "Sudden" includes a temporal element, combining elements of the immediate and the unexpected, and "accidental" is defined as occurring unexpectedly and unintentionally, by chance. In this case, the spillage of contaminants occurred regularly over a period of years in the normal course of transferring materials between trucks and the underground tanks and was not sudden and accidental. The only reasonable inference is that any loss from the tanks was gradual. Embodied in the meaning of "sudden and accidental" is the notion of unexpectedness. Because the pollutants were released in the ordinary course of business over a period of years, the plaintiff

must have expected that spillage would result. Thus, as a matter of law, any release from the plaintiff's business operations could not have been sudden and accidental, and the pollution exclusion should apply.

180 Mich App 651; 447 NW2d 853 (1989) reversed.

*Richard J. Quist* and *Robert N. Sayler* for the plaintiff.

*Mika, Meyers, Beckett & Jones* (by *Douglas A. Donnell* and *Linda L. Blais*) and *Foster, Swift, Collins & Smith, P.C.* (by *Lawrence B. Lindemer*), for the defendant.

Amici Curiae:

*Cooper, Fink & Zausmer, P.C.* (by *David H. Fink, Thomas A. Biscup,* and *Alan D. Wasserman*), for Gelman Sciences Inc. and Ralph Jackson.

*Drinker, Biddle & Reath* (by *Thomas S. Schaufelberger, Steven A. Bennett,* and *John W. Scott*), *Miller, Canfield, Paddock & Stone* (by *Michael B. Ortega*), and *Petersmarck, Callahan, Bauer & Maxwell, P.C.* (by *Neal W. Bauer*), for American Motorists Insurance Company and Lumbermens Mutual Casualty Company.

*Warner, Norcross & Judd* (by *Paul T. Sorensen*) and *Covington & Burling* (by *Robert N. Sayler, Gregg H. Levy,* and *Eric C. Bosset*) for Gencorp, Inc., Laidlaw, Inc., Teledyne Industries, Inc., and the Upjohn Company.

*Rivkin, Radler, Bayh, Hart & Kremer* (by *John L. Rivkin, Alan S. Rutkin,* and *Barbara Si-*

*rothen)* and *Nelson & Krueger* (by *James R. Nelson)* for Michigan Association of Insurance Companies.

*Willingham & Coté, P.C.* (by *John A. Yeager* and *Anthony S. Kogut),* for Michigan Farm Bureau and Farm Bureau Mutual Insurance Company of Michigan.

*Clark, Klein & Beaumont* (by *Dwight H. Vincent* and *Susan J. Sadler)* for Michigan Manufacturers Association.

*Varnum, Riddering, Schmidt & Howlett* (by *Robert J. Eleveld, Matthew D. Zimmerman,* and *Mark S. Allard)* for Michigan Municipal League.

*Clary, Nantz, Wood, Hoffius, Rankin & Cooper* (by *Douglas W. VanEssen* and *Debra L. Geibig)* for Celina Mutual Insurance Company.

CAVANAGH, C.J. We granted leave in this case to consider an insurance contract with a pollution-exclusion clause and an exception to that exclusion where the discharge is sudden and accidental.[1] In applying the definition of the "sudden and accidental" exception to this case, we recognize that the insurance contract contains a duty-to-

---

[1] The exclusion applies:

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

defend clause.[2] Thus, the insurer has a duty to defend against any claim where coverage is even arguable, even where the claim may be groundless or frivolous. The posture of the case is one of summary disposition; there has been no fact finding, and there is, at the very least, a question of fact regarding whether coverage is "arguable." Accordingly, we reverse the decision of the Court of Appeals and remand for further proceedings. To avoid redundancy, we adopt the statement of facts as set out in Justice RILEY's dissent and direct our focus to the resolution of the appeal.

Polkow testified in his deposition that there was frequent spillage during the transfer process from the tanker truck to the underground tanks. These "mini-spills" spanned many years and apparently resulted from ongoing, regular business activity. Admittedly, this could constitute grounds for a trier of fact to conclude that Polkow "expected" the release of contaminants.[3] The difficulty is that there was some evidence that the contaminants at

---

[2] The policy defines the obligation of Citizens Insurance Company as follows:

[To] pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

A. bodily injury or
B. property damage

to which this insurance applies, caused by an occurrence, and the company shall have the right and *duty to defend* any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent . . . . [Emphasis added.]

This obligation hinges upon the presence of a "suit" to defend against; this Court has elected not to address this threshold issue whether a "suit" exists on these facts.

[3] Indeed, the dissent states that "[b]ecause the pollutants were released in the ordinary course of business, and occurred over a period of years, plaintiff must have expected that spillage would result from his transfer operations." *Post,* p 192.

issue were not from these oil leaks and indeed may be entirely unrelated to Polkow's operation.[4] In addition, the contamination may have resulted from a discharge from the underground tanks. In any event, there are factual disputes regarding the cause of the contamination. Therefore, resolution of whether the sudden and accidental exception applies is impossible, given the current state of factual development. The resolution of this question requires an examination of whether the *discharge* of pollutants was sudden and accidental. On a record where it is unclear even *what* the discharge was, how can we, absent some form of augury, possibly declare that this unknown form of discharge was not sudden and accidental? The dissent criticizes the lower court for focusing upon whether the *damage* was "sudden and accidental" rather than on whether the *release* was "sudden and accidental." *Post,* p 189. The dissent, however, declares that the release was not "sudden and accidental" without any determination of exactly what the release *was* in this case. It was the "duty of [the insurer] to undertake the defense until it could confine the claim to a recovery that the policy did not cover." *Jonesville Products, Inc v Transamerica Ins Group,* 156 Mich App 508, 513; 402 NW2d 46 (1986), cited with approval by the majority in *Protective Nat'l Ins Co of Omaha v City of Woodhaven,* 438 Mich 154; 476 NW2d 374 (1991), a companion to this case.

The grant of summary disposition was inappropriate in light of the factual dispute. The dissent would reverse the grant of summary disposition in favor of the plaintiff and impliedly grant summary

---

[4] The contaminants found in the downgrade wells were chlorinated solvents, not any type of oil. One expert, Aqua-Tech, suggested that the contamination of nearby wells *may* have been caused by a nearby electrical substation located upgrade of the affected wells and not by the Polkow facility.

disposition in favor of the defendant: "[D]efendant would have no duty to defend or indemnify. Finally, we decline to address the remaining issues because our disposition of the *pollution exclusion would dispose of this case.*"[5] *Post,* pp 195-196. (Emphasis added.) We accept the proposition that the pollution exclusion is dispositive and that the issue is whether the discharge was sudden and accidental. We note, however, that there has been a lack of factual resolution regarding exactly where the release of the pollution occurred. The insurer's duty to provide a defense extends to allegations which even arguably come within the policy coverage. *Allstate Ins Co v Freeman,* 432 Mich 656; 443 NW2d 734 (1989). Fairness requires that there be a duty to defend at least until there is sufficient factual development to determine what caused the pollution so that a determination can be made regarding whether the discharge was sudden and accidental. Until that time, the allegations must be seen as "arguably" within the comprehensive liability policy, resulting in a duty to defend.

The dissent concedes that "the duty to defend is broader than the duty to indemnify and is properly invoked when claims are even arguably within coverage." *Post,* p 185. In addition, the dissent, citing *Guerdon Industries, Inc v Fidelity & Casualty Co of New York,* 371 Mich 12; 123 NW2d 143 (1963), correctly states, "any doubt pertaining to application of the duty to defend is to be resolved in favor of the insured." *Post,* p 185. But without proof of the source of the discharge, the court cannot determine whether the discharge falls within the pollution-exclusion clause or

---

[5] While the court rules permit a grant of summary disposition to the nonmoving party, even the defendant in this case continues to argue that there are genuine issues of material fact precluding summary disposition.

whether the unknown discharge falls within the sudden and accidental exception to the exclusion clause. This uncertainty creates doubt regarding coverage. Summary disposition was inappropriate.

A remand is needed in this case because application of the pollution-exclusion clause and of the exception to that exclusion depend upon the facts of each case. See *Grant-Southern Iron & Metal Co v CNA Ins Co,* 905 F2d 954 (CA 6, 1990) (summary judgment was reversed on the basis of the existence of a genuine issue of fact regarding how the discharge of contaminants occurred). The circuit court, despite its unsuccessful attempt to get the parties to stipulate facts, resolved the factual disputes itself, thus depriving the parties of the right to an evidentiary hearing. Well-established summary disposition procedures require this Court to reverse the grant of summary disposition and remand the case for factual determinations.

LEVIN, BRICKLEY, and BOYLE, JJ., concurred with CAVANAGH, C.J.

RILEY, J. (*dissenting*). This appeal revolves around a comprehensive general liability insurance policy issued by defendant to plaintiff. The questions presented are:

- whether the damage caused by the release of contaminants is excepted from coverage under the pollution exclusion;
- whether the owned-property exclusion applies to preclude coverage;
- whether an administrative inquiry by a governmental agency constitutes a "suit" under the policy which triggers the insurer's duty to defend;
- whether the costs of responding to an

administrative inquiry constitute "damages" under the policy which require the insurer to reimburse the insured.

We would find that the Court of Appeals erred in holding that the pollution exclusion was inapplicable to the facts of this case. Accordingly, we would reverse the decision of the Court of Appeals.

### I. FACTS AND PROCEEDINGS

Since 1975, plaintiff Robert Polkow has owned and operated an oil-reclamation business, known as Polkow Oiling Service, located near Hillsdale, Michigan.

The business began in 1949, prior to plaintiff's ownership, as a road-oiling operation where crankcase oil was picked up from local businesses and used on roads for dust-control purposes. Plaintiff continued the road-oiling activities when he purchased part of the business in 1975. By 1982, because of state prohibition of road oiling, plaintiff had to discontinue such operations. Since then, plaintiff has limited his business activities to waste-oil reclamation. In conducting oil-reclaiming operations, plaintiff picks up oil from local businesses and transports the oil back to his premises. The oil is then pumped into an underground tank, where the oil separates from water. Once the separation process is complete, the oil is pumped into another tank. Eventually, the oil is sold to a processor.

On plaintiff's business premises, there are eight underground storage tanks ranging in capacity from three thousand to twenty thousand gallons. Plaintiff's deposition reveals that routine spillage of materials often occurred when the materials were transferred between the truck which transported the oils and the underground tanks. The

premises have also been subject to oiling for the purpose of controlling dust. Further, plaintiff conceded that one tank overflow had occurred resulting in spillage, and that he succeeded in cleaning up the materials except for oil which had mixed with sand and dirt. At all relevant times, plaintiff was insured under a liability policy issued by defendant.

In 1981, the Department of Natural Resources notified plaintiff regarding its suspicion that plaintiff's operations were responsible for nearby groundwater contamination. Further contact between the DNR and plaintiff did not occur until 1984, when department officials took soil samples from plaintiff's business premises. On December 17, 1984, plaintiff received a letter from the DNR in which the department apprised plaintiff that samples taken from plaintiff's land had chemical properties similar to contamination found in local groundwater. The DNR concluded that plaintiff was the source of the contamination. The department requested that plaintiff undertake a hydrogeological investigation of his property and remove the source of the contamination, including underground tanks and tainted soil. Plaintiff was also requested to provide a work plan within thirty days outlining proposed remedial measures.

Soon thereafter, plaintiff contacted defendant and requested that defendant undertake to defend plaintiff against the charges by the DNR and indemnify plaintiff for the cost of undertaking a study. Defendant promptly denied coverage, claiming that the pollution-exclusion provision barred coverage.

Plaintiff proceeded to hire an independent contractor to conduct an investigation of the property. The contractor concluded that there was contamination in the area surrounding the underground

tanks, but that plaintiff's operations were not the source of water contamination.

In 1985, the United States Environmental Protection Agency wrote to plaintiff asking for his coöperation in investigating potential groundwater contamination. The next communication from the EPA was received on June 16, 1986, when plaintiff received a letter requesting information about his operations. Since then, no further action has been taken either by the EPA or the DNR.

Upon receiving a second request by plaintiff for defense and indemnification, defendant again refused coverage, following which, on September 22, 1986, plaintiff filed an action for declaratory judgment to determine his rights under the liability policy. On November 24, 1987, the trial court granted plaintiff's motion for summary disposition, finding that defendant had a duty to defend and a duty to indemnify plaintiff for costs incurred in response to governmental inquiries. The declaratory judgment was filed on April 4, 1988. The final judgment awarded plaintiff $22,398.36, which included reimbursement for the investigation, attorney fees, and other costs incurred in responding to charges by the DNR and the EPA.

Defendant appealed, and the Court of Appeals affirmed the findings of the trial court. 180 Mich App 651; 447 NW2d 853 (1989). Defendant sought leave to appeal to this Court, and we granted leave on July 13, 1990, together with *Protective Nat'l Ins Co of Omaha v City of Woodhaven* and *Upjohn Co v New Hampshire Ins Co,* 435 Mich 862 (1990).

## II. ANALYSIS

Plaintiff argues that defendant has a duty to indemnify and a duty to defend charges of contamination by the DNR and the EPA. In addressing this

argument, we note first that the duty to defend is broader than the duty to indemnify and is properly invoked when claims are even arguably within coverage. *Detroit Edison Co v Michigan Mutual Ins Co,* 102 Mich App 136, 142; 301 NW2d 832 (1980). We note also, however, that the duty to defend does not rest solely on pleadings; "it is necessary to focus on the basis for the injury and not the nomenclature of the underlying claim in order to determine whether coverage exists." *Illinois Employers Ins of Wausau v Dragovich,* 139 Mich App 502, 507; 362 NW2d 767 (1984). Furthermore, any doubt pertaining to application of the duty to defend is to be resolved in favor of the insured. *Guerdon Industries, Inc v Fidelity Casualty Co of New York,* 371 Mich 12, 18-19; 123 NW2d 143 (1963). Thus, only if there is a possibility of coverage on the basis of the underlying facts is there a duty to defend.

When interpreting insurance policies, we are guided by various rules of construction which frame our inquiry. As a general rule, policy language that is ambiguous is to be construed in favor of the insured. *Powers v DAIIE,* 427 Mich 602, 624; 348 NW2d 411 (1986). Unless a term is clearly defined in a policy, the court will adopt a meaning in accordance with the common usage of the term. *Fireman's Fund Ins Cos v Ex-Cell-O Corp,* 702 F Supp 1317, 1323, n 7 (ED Mich, 1988). We would not, nor should this Court create an ambiguity where none exists. *Edgar's Warehouse, Inc v United States Fidelity & Guaranty Co,* 375 Mich 598; 134 NW2d 746 (1965). Furthermore, we will not rewrite clear and unambiguous language under the guise of interpretation. *Eghotz v Creech,* 365 Mich 527, 530; 113 NW2d 815 (1962). With these rules in mind, we look to the specific policy language at issue in this case.

A

The first issue we address is whether coverage is precluded under the policy's pollution exclusion.[1] Exclusion (f) states that insurance does not apply:

(f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.* [Emphasis added.]

In holding that the pollution exclusion did not bar coverage for environmental damage caused by plaintiff's activities, the Court of Appeals stated:

There is nothing in this case to indicate that plaintiff expected or intended to spill pollutants that would contaminate the soil or ground water. Whether or not the contamination detected by the DNR ultimately is determined to be attributable to plaintiff does not matter. The essential allegation against plaintiff is that his business activities resulted in such contamination, and the evidence submitted below indicates without contradiction that the *contamination was unexpected and unintended from his standpoint.* [180 Mich App 658. Emphasis added.]

In analyzing exclusion (f), the Court of Appeals construed "sudden" to mean unexpected, and "accidental" to mean unintended. The Court stated that the "contamination was unexpected and un-

---

[1] Because neither party argued the issue before this Court, we need not address whether there was an "occurrence" under the policy language.

intended," and found that the exclusion was inapplicable. *Id.* However, the pollution exclusion bars recovery unless the "discharge, dispersal, release or escape is *sudden and accidental.*" Thus, the proper focus is not whether the *contamination* or damage is "sudden and accidental," but whether the *release* is "sudden and accidental." The Court of Appeals decision was criticized in *Ray Industries, Inc v Liberty Mutual Ins Co,* 728 F Supp 1310, 1317 (ED Mich, 1989):

> By holding that the phrase "sudden and accidental" means "unexpected and unintended," *Polkow* erases the pollution exclusion. Coverage is still triggered when the harm was unexpected and unintended from the insured's standpoint, under *Allstate* [*Ins Co v Freeman,* 432 Mich 656; 443 NW2d 734 (1980)]. Pollution-related damage is still theoretically excluded from coverage. However, *Polkow* would then make an exception to the pollution exclusion if the contamination was unexpected and unintended from the insured's standpoint. The result of this circularity is that the only necessary inquiry is whether an occurrence took place.

The court went on to state:

> This [pollution-exclusion] language, like that in the case now before me, requires that the *discharge* of pollutants be sudden and accidental.
> After reciting this language, however, the appellate court found the contamination, rather than the discharge, in its case was sudden and accidental. . . .
>
> \*   \*   \*
>
> Contamination is the *harm* caused by the discharge, not the discharge itself. Because *Polkow* is at odds with the language of its policy, I am persuaded the Michigan Supreme Court would not follow it. [*Id.* Emphasis in original.]

By focusing on the contamination rather than the release, the Court of Appeals equated the definition of "sudden and accidental" with that of "occurrence," and the concomitant onset of coverage. The same policy language was at issue in *Lumbermens Mutual Casualty Co v Belleville Industries, Inc*, 407 Mass 675, 679; 555 NE2d 568 (1990):

> It is the release of pollutants itself that must have occurred suddenly, if the exception is to apply so as to provide coverage. The exception thus focuses on the circumstances of the release. In deciding whether there was an occurrence, on the other hand, the focus of the inquiry is on the property damage, asking whether it was expected or intended from the insured's point of view. Courts that have failed to appreciate this distinction have led themselves to identify an ambiguity in the policy language that does not exist.

Other courts have been understandably reluctant to treat the definitions of "occurrence" and a "sudden and accidental" event as interchangeable when reading the policy as a whole. The court in *United States Fidelity & Guaranty Co v Star Fire Coals, Inc*, 856 F2d 31, 34 (CA 6, 1988), stated:

> We have no difficulty reconciling the two provisions. We believe the "occurrence" definition results in a policy that provides coverage for continuous or repeated exposure to conditions causing damages in all cases except those involving pollution, where coverage is limited to those situations where the *discharge* was "sudden and accidental." . . .
>
> It must also be emphasized that the focus of this "sudden and accidental" exception to the general pollution exclusion clause is on the nature of the discharge of the pollution itself, not on the nature of the damages caused. [Emphasis in original.]

We would find that the Court of Appeals incorrectly focused on the contamination or damage, rather than the release of pollutants in evaluating the pollution exclusion. Clearly, the definition of "occurrence" is not intended to be coterminous with a "sudden and accidental" release.

B

Upon belief that the Court of Appeals erroneously interpreted the pollution exclusion, we embark on the proper inquiry, whether the release of pollutants was "sudden and accidental," thereby falling within the exception to the exclusion.

In *Upjohn Co v New Hampshire Ins Co,* 438 Mich 197, 207-208; 476 NW2d 392 (1991), a companion case to this one, the Court determined that the phrase "sudden and accidental" was plain and unambiguous. Thus, there is no need to look outside the contract to interpret the phrase. In *Upjohn,* the Court adopted a definition of "sudden" which includes a temporal element. "Sudden" combines elements of the "immediate and the unexpected." The Court determined that " 'sudden' " means " ' "happening, coming, made or done quickly, without warning or unexpectedly; abrupt." ' " For purposes of interpreting exclusion (f), the Court defined "accidental" as " '[o]ccurring unexpectedly and unintentionally; by chance.' "

In order to assess the effect of the pollution exclusion on the facts of this case, we look to several cases which interpret the exclusion.

In *Industrial Indemnity Ins Co v Crown Auto Dealerships, Inc,* 731 F Supp 1517, 1518 (MD Fla, 1990), the defendant contributed crankcase oil to Peak Oil Company, an oil reprocessing business. Because of contamination at the site, the EPA cited the defendant as a "potentially responsible part[y]"

under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 USC 9607. Subsequently, the defendant sought, but was refused, liability protection from the plaintiff. The court determined that the plaintiff had no duty to defend or indemnify the defendant. The court recited relevant statements from the deposition of a Peak Oil executive:

> "I recall that a number of accidental overflows occurred during the filling of the used oil holding tanks, some of which resulted in fairly large spills. . . . Also despite our efforts to impress on our employees the need for safety at all times, occasional carelessness by employees resulted in accidental spills during the transfer of used oil from trucks to storage tanks. I recall a number of accidental spills that occurred when a byproduct of the distillate process was pumped to a storage tank." [*Id.* at 1521.]

The court adopted a definition of "sudden" with a temporal aspect, and went on to find that the spills and leaks, as a matter of law, could not be "sudden" because they occurred during the normal course of business, and the discharges occurred gradually over many years. Quoting from *American Mutual Liability Ins Co v Neville Chemical Co,* 650 F Supp 929, 933 (WD Pa, 1987), the court stated that "contamination . . . by disposing of chemicals in the lagoon, or by annual careless spillage onto the ground surface cannot be sudden, or unexpected and accidental . . . ." *Id.*

In *Star Fire Coals, supra,* the defendant operated a coal tipple which produced a substantial amount of coal dust during normal operations. When a neighboring landowner brought suit against the defendant, and the defendant asked the plaintiff for coverage, the plaintiff refused. The

court held that discharges from the defendant's tipple in the regular course of business, for a period of years, could not be considered "sudden." Thus, the court found that the plaintiff had no duty to defend or indemnify the defendant. See also *Fischer & Porter Co v Liberty Mutual Ins Co,* 656 F Supp 132 (ED Pa, 1986) (contamination caused by releases of trichloroethylene as a result of routine business operations cannot be considered "sudden" or "accidental"), and *Weber v IMT Ins Co,* 462 NW2d 283 (Iowa, 1990) (history of spillage and tracking of manure onto road supported court's finding that spillage was expected, and therefore not "accidental").

In *C L Hauthaway & Sons Corp v American Motorists Ins Co,* 712 F Supp 265, 268 (D Mass, 1989), the plaintiff transferred a material named toluene in underground pipes within its facility. A release occurred which resulted in contamination to the water table beneath the facility. The court applied the pollution exclusion because it found that the gradual release of materials from the plaintiff's pipe was not "sudden." The court stated, "it offends common sense to describe such a gradual leak as 'sudden,' and this Court can not strain the clear meaning of a word to reach a preconceived result."

In the instant case, it is undisputed that spillage occurred over a period of years as a result of plaintiff's routine business operations.[2] The spills which occurred regularly, in the normal course of

---

[2] At his deposition, plaintiff was questioned about spillage of pollutants:

> *Q.* How often do you have spills—or some materials get on the ground, I won't call it "a spill," some materials get on the ground?
> *A.* Well, how much are you talking about? I mean, when you disconnect your hose before you get your cap on there, you might have some get on the ground, it depends upon how heavy

transferring materials between the truck and the underground tank, were not "sudden and accidental" releases. Certainly, embodied in the meaning of both words, "sudden and accidental," is the notion of unexpectedness. If plaintiff expected the releases, then the releases could not have been "sudden and accidental." Because the pollutants were released in the ordinary course of business, and occurred over a period of years, plaintiff must have expected that spillage would result from his transfer operations. Therefore, we would find that the routine discharges were not "sudden and accidental."

Another possible source of contamination is the underground tanks. In a 1984 letter, the DNR wrote plaintiff that it suspected the tanks as possible sources. However, despite the fact that the tanks have never been tested for leakage, the only reasonable inference from the given facts is that any underground release was gradual, and not "sudden."[3]

---

it is or how light it is. You shut your valve off, but there is always some in there.

[3] The majority opinion indicates that it is troubled by what it views as a lack of factual development and believes a trial would shed additional light on the nature of the releases. However, at the time of the trial court's summary ruling, the parties had exhausted their time for discovery and there was a substantial factual record. Plaintiff's motion for summary disposition was not filed until approximately one year after the filing of the complaint. The opinion and order granting judgment was not filed until one year and two months after the complaint. The record shows that the parties were to complete discovery by September 1, 1987, while the opinion was filed on November 24, 1987. Thus, discovery was presumably complete at the time of the ruling, and there was a sufficient factual basis for summary disposition.

The discovery materials included requests for production of documents, requests for admission, plaintiff's affidavit, answers to interrogatories, the deposition of plaintiff, the deposition of Lawrence Austin who performed the investigation of plaintiff's property, the written report by Austin's consulting service, and correspondence from the DNR, EPA, and Citizens Insurance Company.

Plaintiff acknowledged in his deposition that the contamination was present around the fifteen thousand gallon tank, and the pair of twenty thousand gallon tanks. Plaintiff also admitted that he predominantly used one of the twenty thousand gallon tanks, and one of the fifteen thousand gallon tanks, at least up until the time of the deposition. Certainly, if plaintiff was using the tanks where the contamination occurred until the time of the deposition, which was several years after ground water and soil contamination were detected, he would have been aware of any earlier sudden loss of materials which caused the damage. If there was a sudden rupture in the tanks he was using, he would not have been able to retrieve materials which he pumped in, and he would have been aware of a loss of materials. However, plaintiff stated in his deposition that he never had an "unaccounted for loss of materials from a tank."[4]

Given the fact that plaintiff continued to use the tanks years beyond the time when contamination was detected, and that he never realized an unaccounted loss of materials, the only reasonable inference is that any loss from the tanks was gradual.[5] Given the meaning of "sudden," and the

[4] In this regard, plaintiff also acknowledged that he used a dipstick for measuring volume in the tanks.

[5] We believe the burden of proving a "sudden and accidental" release is on the plaintiff. In *Fireman's Fund v Ex-Cell-O, supra* at 1328, the court discussed the allocation of burden:

> First, an estimate of the probabilities points towards allocating the burden to Policyholders. To claim that they come within the "sudden and accidental" exception to the pollution exclusion, Policyholders must contend that the more unusual event occurred—that the discharge or release of pollutants was sudden and accidental.
>
> Second, fairness weighs heavily in Wausau's favor. Policyholders possess the information pertaining to their activities. It would impose [an] undue burden on Wausau to require it to ferret out evidence of Policyholders' sudden and accidental

accompanying temporal element, we would find that any discharge from plaintiff's tanks could not have been "sudden." Thus, as a matter of law, we would find that any release from plaintiff's business operations could not have been "sudden and accidental." Because there was no "sudden and accidental" release, we would hold that the pollution exclusion bars coverage under the policy. As a result, defendant should have no duty to defend or indemnify under the insurance contract.

Chief Justice CAVANAGH, in his majority opinion, argues that there was not enough factual

discharge of pollutants in twelve sites in four states over a period of seven years. Policyholders can more easily produce this evidence.

Third, special public policy considerations do not argue either for Policyholders or Wausau.

The court in *Ex-Cell-O* found that the policyholder had the burden of producing evidence and the burden of persuasion on the "sudden and accidental" exception to the pollution exclusion.

The court in *Fischer & Porter v Liberty Mutual Ins, supra* at 140, also discussed the allocation of the burden of proof. The court stated:

The burden of proving that claim comes within the coverage provisions of the policy fall[s] upon the insured. [Citation omitted.]

The burden of proving a defense, or an exception to coverage, is upon the insurer. However, "sudden and accidental" is an aspect of *coverage,* which is Fischer & Porter's burden to prove. [Emphasis in original.]

In the instant case, plaintiff has not offered any evidence suggesting a sudden and accidental release of contaminants on his property. Thus, the fact that

- plaintiff has the burden of producing evidence of a sudden discharge,
- he is in the best position to come forward with evidence of that nature,
- he has not done so in the fourteen months prior to the trial court ruling,

compels the conclusion that there is no room for a reasonable inference of a sudden discharge.

development below to summarily dispose of this case. In his opinion, he states:

> The difficulty is that there was some evidence that the contaminants at issue were not from these oil leaks and indeed may be entirely unrelated to Polkow's operation. In addition, the contamination may have resulted from a discharge from the underground tanks. [*Ante,* pp 178-179.]

This argument misses the mark. The fact that a nearby electrical substation may have caused the contamination would not cause us to change our analysis. Clearly, if the cause was outside of plaintiff's operation, the insurance policy is not called into question because plaintiff would not be "legally obligated" to pay under such circumstances. Thus, the only matter at issue here is whether releases at plaintiff's operations were sudden and accidental. We would conclude that they were not because spillage due to transfer operations was expected, and plaintiff continued to use the tanks in his ongoing business without notice of any sudden loss of materials.

### III. CONCLUSION

In summary, we would hold that neither the routine release of materials over a period of years nor the gradual leakage of an underground tank can be considered "sudden and accidental" events. Thus, we would hold that the pollution exclusion bars coverage for any release which occurred on plaintiff's property and, consequently, defendant would have no duty to defend or indemnify.

Finally, we decline to address the remaining issues because our disposition of the pollution

exclusion would dispose of this case.[6] Thus, we would reverse the decision of the Court of Appeals.

GRIFFIN and MALLETT, JJ., concurred with RILEY, J.

---

[6] Finally, but certainly not of least importance, we note that the majority has ignored the parties' efforts on the three remaining issues. This opinion only deals with the pollution-exclusion issue because we would dispose of the case on this issue. However, the majority neglects the remaining issues by remanding to resolve questions of fact surrounding the application of the pollution exclusion, and failing in even an attempt to dispose of the case on any of the other issues.