989 F.2d 499
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
HI-MILL MANUFACTURING CO., Plaintiff-Appellee,
v.
AETNA CASUALTY & SURETY CO., Defendant-Appellant.
 No. 92-1351.
 United States Court of Appeals, Sixth Circuit.
 March 18, 1993.
As Amended June 8, 1993.
 
 Before KENNEDY and BATCHELDER, Circuit Judges, and ENGEL, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 In this appeal, defendant-appellant Aetna Casualty and Surety Co. (Aetna) appeals the district court's granting of partial summary judgment for plaintiff-appellee Hi-Mill Manufacturing Co. (Hi-Mill) in a declaratory judgment action brought by Hi-Mill for defense and indemnification of environmental contamination. We reverse the district court because a PRP letter from the Environmental Protection Agency (EPA) is not "a suit" triggering the duty to defend under Aetna's policies with Hi-Mill.
 
 I.
 
 2
 Hi-Mill Manufacturing Co. is a family-run business that makes aluminum and copper tubing. From 1946 until 1978, Hi-Mill used a corrosive pickling process to acid strip the outer layer of its finished products. The acid contained sulfuric acid, nitric acid and di-chromate.
 
 
 3
 This pickling process generated waste, made up of the pickling process chemicals diluted with rinse water, that was discharged onto the ground behind the plant. In the late 1960s, after consulting with the Michigan Department of Natural Resources (MDNR), Hi-Mill constructed a clay-bottomed waste lagoon on the property into which it began discharging its waste. When the lagoon would become full, Hi-Mill would pump the pickling waste onto the surrounding Hi-Mill property.
 
 
 4
 In 1972, the MDNR received an anonymous letter from Hi-Mill employees complaining that the discharges might be contaminating the drinking wells and the marsh in the adjacent state-owned recreation area. MDNR visited Hi-Mill and found that one drinking fountain, the holding pond and the marsh contained excessive levels of metals. The MDNR did not take any action in regard to its findings and did not revisit the site for three years.
 
 
 5
 Following the passage of the Clean Water Act, MDNR informed Hi-Mill by letter on August 18, 1975, that it should apply to the MDNR for a groundwater discharge permit for the holding pond. In September of 1975, Hi-Mill retained environmental consultant Gregory Dean to assist in preparing an application for a groundwater discharge permit. Later that year, Hi-Mill received the groundwater discharge permit, which allowed Hi-Mill to continue to discharge its process waste into the lagoon up until 1980, but prohibited any overflow to the adjacent marsh.
 
 
 6
 When the MDNR visited Hi-Mill in 1976, the representative noticed water trickling from the pond into the marsh. He noted that Hi-Mill seemed willing to correct the problem. After consulting with MDNR about a design idea, Hi-Mill enlarged its lagoon and added a second smaller lagoon to prevent overflows. However, in November 1977 and April 1978, MDNR's staff again observed the lagoons overflowing into the marsh and told the company that it was violating its permit. In 1978, Hi-Mill changed its operations to eliminate all discharges to the holding ponds.
 
 
 7
 In 1983, Hi-Mill approached the MDNR about how to remove the lagoon. Hi-Mill, on its own, installed nozzles to make a fine spray of the liquid from the ponds into the air, in an effort to evaporate the ponds. When the MDNR told Hi-Mill to stop the practice because the spray could be carried off-site, Hi-Mill did so. MDNR's notes show that in 1986 Hi-Mill's pwmers believed that "they have corrected their contamination problem." However, in 1988, Hi-Mill was nominated by the MDNR for the National Priorities List (NPL) as a Superfund site. On June 28, 1988, Hi-Mill received a potentially responsible party (PRP) letter from the EPA, stating that if Hi-Mill did not perform investigation of the waste, the EPA would do so. At this point, Hi-Mill consulted with an environmental attorney and also retained an environmental consulting firm, which determined that Hi-Mill should not qualify for the NPL. Hi-Mill then attempted to get the company removed from the NPL list, but on September 28, 1988, MDNR refused to re-score the site, thus guaranteeing that Hi-Mill would remain on the NPL. At 4:00 p.m. the next day, Hi-Mill was given the "option" of signing a consent order with the EPA by 5:00 p.m. at which they agreed either to investigate cleaning up the site or to have the EPA do so at Hi-Mill's expense. Hi-Mill signed the consent order agreeing to investigate the site, rather than having the EPA do so.
 
 
 8
 During the period from 1968 until 1988, an Aetna loss control engineer had visited the Hi-Mill site four times a year to examine the work site in general for loss prevention. On October 18, 1988, Hi-Mill gave Aetna written notice of its claim under its comprehensive general liability (CGL) policies with Aetna. The applicable policy language is as follows:
 
 
 9
 The company will pay on behalf of the insured all sums which the insured shall be legally obligated to pay as damages because of:
 
 Bodily Injury or
 Property Damage
 
 10
 To which the policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.
 
 
 11
 Aetna-Hi-Mill policy (emphasis added). Aetna denied coverage on May 31, 1990.
 
 
 12
 Hi-Mill filed this declaratory judgment action seeking defense and indemnity costs from Aetna for the investigation and potential clean-up of soil and groundwater contamination at the Hi-Mill facility. Hi-Mill filed a partial motion for summary judgment, contending that its receipt of a PRP letter from the EPA imposed on Aetna a duty to defend Hi-Mill in the EPA administrative proceeding. Aetna responded that a PRP letter is not a "suit" giving rise to the duty to defend or to provide coverage under the policies; that the potential clean-up remedies do not constitute "damages"; and that Hi-Mill failed to show that its defense costs were used to demonstrate that Hi-Mill is not liable for the underlying environmental contamination. Aetna cross-moved for summary judgment, stating that Hi-Mill's assumption of obligations under the consent order relieved Aetna from any potential liability and that Hi-Mill failed to provide notice of the alleged occurrence "as soon as practicable."
 
 
 13
 After oral argument, the district court granted Hi-Mill's motion, ruling that Hi-Mill's receipt of a PRP letter imposed on Aetna a duty to defend. It declined to rule that the clean-up remedies do not constitute damages. The court ruled that further discovery was necessary before it could determine the amount of funds that Hi-Mill had expended in "defense costs." The court denied Aetna's cross motion, holding that neither Hi-Mill's late notice to Aetna nor the EPA consent order prejudiced Aetna. Aetna now appeals.
 
 II.
 
 14
 We first address defendant-appellant Aetna's argument that a PRP letter from the EPA is not a "suit" under the Aetna insurance policy, and, therefore, it does not trigger the duty to defend against the EPA's administrative proceeding. We apply Michigan law to this declaratory judgment action based on diversity jurisdiction. See Ray Indus., Inc. v. Liberty Mutual Ins. Co., 974 F.2d at 761,Y (Michigan law governs diversity case).
 
 
 15
 Appellee Hi-Mill has filed a motion to certify this question to the Michigan Supreme Court. Hi-Mill acknowledges that this Circuit in Ray Industries, Inc. v. Liberty Mutual Ins. Co., 974 F.2d 754 (6th Cir.1992), held that a PRP letter is not a "suit" under Michigan law, and that Ray Industries 's holding is binding on this panel, unless an en banc panel overrules Ray Industries or unless the Michigan Supreme Court decides the issue differently. Salmi v. Secretary of Health & Human Servs., 774 F.2d 685, 689 (6th Cir.1985). Hi-Mill, therefore, argues that this panel should certify the question to the Michigan Supreme Court because the issue is one of profound importance for individuals in the State of Michigan; because there is Michigan Court of Appeals authority holding that a PRP letter is a "suit"; and because there is uncertainty in a federal court's predicting how a state's highest court would decide an issue.
 
 
 16
 We decline to certify this issue to the Michigan Supreme Court because this Circuit has already decided the issue in Ray Industries, and we are bound by that decision. Although the panel in Ray Industries might have had the option of certifying the question to the Michigan Supreme Court, we believe that this panel's doing so would establish an undesirable practice of permitting panels to avoid this Circuit's precedent through certification. We think it worth noting that the Michigan Supreme Court has had the opportunity to address this issue but has declined to do so. See Polkow v. Citizens Ins. Co. of America, 438 Mich. 174, 476 N.W.2d 382 (1991) (court failed to address whether PRP letter is a "suit", although it acknowledged that this was a "threshold issue" in the case), rehearing denied, 439 Mich. 1202 (1991); City of Evart v. Home Ins. Co., 439 Mich. 921, 479 N.W.2d 638 (1992) (leave for review denied after court initially held leave in abeyance pending decision in Polkow and two other cases). Should the Michigan Supreme Court decide the issue differently in the future, we will be bound by that determination if it varies from our prediction in Ray Industries. Accordingly, the issue will not be certified to the Michigan Supreme Court.
 
 
 17
 Turning to the merits of this case, we find that the district court erred in finding that a PRP letter is a suit under the Aetna policy and Michigan law, and therefore we reverse its ruling that the PRP letter triggered the duty to defend against the EPA's actions. Our holding in Ray Industries v. Liberty Mutual Insurance Co., 974 F.2d at 761, is dispositive of this issue. In Ray Industries, we addressed the precise question that is involved here: Does a PRP letter from the EPA notifying a business that it is considered a potentially responsible party constitute a "suit" under Michigan law, triggering an insurance company's duty to defend? We predicted in Ray Industries that the Michigan Supreme Court would give "suit" a narrow definition and therefore held that "we do not believe that the PRP letter triggered [the insurance company's] duty to defend in this case." Id. at 761. Because Ray Industries is not distinguishable from this case, we find that the PRP letter from the EPA to Hi-Mill did not trigger Aetna's duty to defend against the EPA's actions under Michigan law. We express no opinion as to whether Aetna may in the future have a duty to defend if and when 1) the EPA in fact files "a suit" against Hi-Mill over this incident and 2) all the other requirements of the policy are met.
 
 III.
 
 18
 Aetna makes three additional arguments: 1) that it has no duty to defend because a PRP letter is not a suit for "damages"; 2) that Hi-Mill breached the insurance contract by not giving Aetna sufficient notice as required by the policies; and 3) that Hi-Mill breached the insurance contract by entering into a consent order with the EPA without consulting with Aetna. The district court addressed each of these issues and found 1) that a PRP letter constitutes a suit for "damages"; 2) that Hi-Mill did not breach the policy because even if notice was late, Aetna was not prejudiced by it; and 3) that Hi-Mill did not breach the insurance contract by entering into the consent order with the EPA.
 
 
 19
 We cannot address the district court's holdings as to these three issues. Because we have held that no "suit" has been filed, necessarily no suit for damages has been filed. The other two issues go to the question of liability and are not yet ripe for adjudication. Therefore, we vacate the remainder of the district court opinion and dismiss without prejudice the duty to defend portion of this declaratory judgment action.
 
 IV.
 
 20
 Accordingly, we refuse to certify to the Michigan Supreme Court the question of whether a PRP letter constitutes a "suit" under the policy. We REVERSE the district court's finding that a PRP letter is a "suit" triggering the duty to defend, and we dismiss without prejudice the duty to defend portion of this declaratory judgment action.[1] The other issues raised by appellant are not ripe for adjudication, and therefore, we vacate the remainder of the district court's opinion.
 
 
 
 [1]
 Plaintiff-appellee Hi-Mill filed a motion pursuant to Federal Rule of Appellate Procedure 40 or Federal Rule of Appellate Procedure 27 for a correction of our original per curiam opinion filed on March 18, 1993. Hi-Mill requested that we modify the judgment action dealing with the duty to defend, and not the entire declaratory judgment action, as we did in our original opinion. We grant plaintiff's motion for correction under Rule 27
 It is true that in Michigan the duty to defend is considerably broader than the duty to indemnify. Iacobelli Constr. Co. v. Western Cas. & Sur. Co., 130 Mich.App. 255, 343 N.W.2d 517, 520 (1983). The duty to defend is distinct and independent of an insurer's duty to pay. Upjohn Co. v. Aetna Cas. & Sur. Co., 768 F.Supp. 1186 (W.D.Mich. 1990) (citing Stockdale v. Jamison, 416 Mich. 217, 330 N.W.2d 389 (1982)).
 Here, the district court addressed the duty to defend but not the duty to indemnify, and specifically "retain[ed] jurisdiction over the remainder of this action . . . for the purpose of adjudicating, if such should become necessary, defendant's duty to indemnify." Therefore, only Aetna's duty to defend was before us. Since an insured's obligation to indemnify is not dependent upon filing a "suit," Ray Indus. v. Liberty Mutual, 974 F.2d at 759, our disposition of the duty to defend issue does not affect the indemnity issue that may arise in the future. We alter our opinion to dismiss without prejudice only the duty to defend portion of the suit.