### CENTER FOR CREATIVE STUDIES, Plaintiff,

### v.

### AETNA LIFE AND CASUALTY COMPANY, Aetna Casualty and Surety Company of Illinois, and Aetna Casualty and Surety Company, Defendants.

#### No. 94–CV–70896–DT.

United States District Court, E.D. Michigan, Southern Division.

Dec. 8, 1994.

Jonathan T. Walton, Jr., Paul E. Scheidemantel, Clark, Klein and Beaumont, Detroit, MI, for plaintiff.

Daniel G. Litchfield, Mitchell H. Frazen, Burdit & Radzius, Chartered, Chicago, IL, Michael F. Condit, Condit, McGarry & Schloff, P.C., Bloomfield Hills, MI, for defendants.

## OPINION

DUGGAN, District Judge.

Before this Court are plaintiff's and defendants' cross motions for summary judgment.

### I. Background

Plaintiff, Center for Creative Studies (Center), is a non-profit educational institution in Detroit, which specializes in creative arts education (degree programs in fine arts, industrial design, graphic communications and photography).

In September of 1992, one of Center's former students, Linda Dittmer, filed a lawsuit in the Wayne County Circuit Court. Dittmer alleged that in September 1989 she became ill from exposure to a "photographic chemical" product that she was using to develop film in a darkroom during a photography class. Specifically, she alleges that she "was overcome by the fumes form [sic] the chemicals and was exposed to high levels of toxic fumes." (Pl's.Br.Ex. F, Dittmer's Compl. ¶ 10). She alleged that Center failed to instruct her on the proper usage of the chemical, failed to warn her of potential dangers associated with the use of the product and failed to properly ventilate the darkroom (all forming the basis of a negligence claim against Center).

In September 1992, Center tendered the defense of the suit to Aetna Illinois (Aetna).[1] Aetna retained counsel to defend Center and did not assert a reservation of rights or request a non-waiver agreement. Dittmer dismissed the complaint without prejudice within approximately one year's time.

In October 1993, Dittmer filed a second complaint against Center in the Wayne County Circuit Court (the allegations were essentially the same as those made in the first suit). Center again tendered its defense to Aetna. This time, however, Aetna denied coverage pursuant to a letter dated October 15, 1993. Aetna refused to provide any further defense of Center after November 14, 1993, asserting that the Pollution Exclusion clause of the insurance policy[2] justified denial of coverage for the suit.

---

1. Aetna Illinois issued the Primary Policy, which included a Commercial General Liability Coverage Form (CGLCF) and Aetna Casualty issued the Umbrella Policy. This opinion will refer to defendant as Aetna, in general, unless otherwise indicated.

2. The *Coverages* section provides for "Exclusions," including one regarding pollutants that provides that:
   f. (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:
   (a) At or from premises you own, rent or occupy;

   \* \* \* \* \* \*

   Pollutants means [sic] any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed. (Pl's.Br.Ex. A, CGLCF at 2).
   Aetna Casualty issued a Commercial Excess (Umbrella) Policy, Policy No. 65 XS 5088081 WCA, to Center for the same policy period as the Primary Policy. The coverage under the Um-

Plaintiff filed this action on March 8, 1994, requesting the Court to determine that defendants are required to defend and indemnify against a personal injury claim by one of plaintiff's former students. Plaintiff maintains that Aetna's failure to defend Center in the underlying state action is a breach of its contract of insurance.

The facts in this case are not in dispute, and therefore, both parties agree that this case can be decided by summary judgment.

## II. Discussion

### A. Applicable Law

The Court shall apply the state law that the state court would apply. *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). The parties do not dispute that Michigan law must be applied.

The Michigan courts have explained that:

[t]he duty of the insurer to defend the insured depends upon the allegations in the complaint of the third party in his or her action against the insured. This duty is not limited to meritorious suits and may even extend to actions which are groundless, false, or fraudulent, so long as the allegations, against the insured *even arguably* come within the policy coverage. An insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy. The duty to defend cannot be limited by the precise language of the pleadings. The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible. In a case of doubt as to whether or not the complaint against the

insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor.

*Protective Nat'l Ins. v. Woodhaven*, 438 Mich. 154, 159, 476 N.W.2d 374 (1991) (emphasis in original) (citations omitted). The Court indicated that "it was the duty of [the insurer] to undertake the defense until it could confine the claim to a recovery that the policy did not cover." *Id.* at 159–60, 476 N.W.2d 374 (citation and footnote omitted).

Michigan courts have found that "[i]nitially, in determining whether a policy applies, we first must determine whether the policy is clear and unambiguous on its face. We cannot create an ambiguity where none exists." *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 206, 476 N.W.2d 392 (1991) (citations omitted). Similarly, the courts "reject the temptation to rewrite the plain and unambiguous meaning of the policy under the guise of interpretation. Rather, we enforce the terms of the contract as written. If the language of the policy is unambiguous, it must be considered 'in its plain and easily understood sense.'" *Id.* at 207, 476 N.W.2d 392 (citations omitted).

### B. History of Pollution Exclusion Language

As indicated by Professor Jeffrey Stempel, "[o]ne of the most hotly litigated insurance coverage questions of the late 1980s and early 1990s has been the scope and application of the pollution exclusion contained in the standard commercial general liability (CGL) policy." Jeffrey W. Stempel, *Interpretation of Insurance Contracts: Law and Strategy for Insurers and Policyholders* 825 (1994) [hereinafter *Interpretation*].[3] The

---

brella is also subject to a Pollution Exclusion (Defs.' Resp.Br.Ex. F, Umbrella Policy at 2–3), which contains the same language as the Primary Policy.

According to plaintiff, when Aetna issued the policy, it sent a notice to Center regarding the Pollution Exclusion language, which indicated that:

[t]he pollution exclusion in your new policy excludes almost all pollution losses such as pollution at or from premises you own, rent, or occupy or from premises which you owned, rented, or occupied in the past. Pollution re-

sulting from waste is not covered wherever it occurs. PLEASE READ "EXCLUSION—POLLUTION (PREMISES, WASTE, OPERATIONS)" FOR COMPLETE DETAILS. (Pl's.Br.Ex. C.).

3. Stempel explains that:

[t]he story of the ongoing dispute has its roots in the pre–1966 CGL form, which provided coverage for property damage or bodily injury "caused by accident." The issue arose as to the meaning of the word "accident," with insurers arguing it meant a discrete event

impetus for development of such pollution exclusion language was the increasing damage claims "caused by pollutants released by the policyholders [in dramatic fashion in locations such as] Times Beach [and] Love Canal." *Id.; see also West Am. Ins. Co. v. Tufco Flooring East, Inc.,* 104 N.C.App. 312, 409 S.E.2d 692, 699 (1991).[4]

## C. Interpretation of the Old Exclusion Language

The "sudden and accidental" exclusion language was prominent between 1970–1984. Beginning in 1984, the new "more" absolute exclusion language (which is the type at issue before this Court) began to be written into policies. *Interpretation* at 826.

The biggest interpretation issue to date has been over what the terms "sudden" and "accidental" mean. The cases dealing with this issue have been evenly divided between courts finding coverage for gradual pollution and others finding coverage only when the pollution was unexpected and occurred rapidly. *Id.* 835 nn. 8–9 (listing cases on both sides of the issue).

In 1991, the Michigan Supreme Court in a series of three cases, found that the "sudden and accidental" pollution exclusion covers only abrupt discharges. *Woodhaven,* 438 Mich. at 161–63, 476 N.W.2d 374; *Polkow;* 438 Mich. at 189, 476 N.W.2d 382 (Riley, J., dissenting); *Upjohn,* 438 Mich. at 207–10, 476 N.W.2d 392.

## D. New "Absolute" Language

Stempel explains that "after the beginning of the challenge to the [insurance] industry's

> while policyholders argued that it meant fortuitous, unintended loss. Most courts accepted the policyholders' view, prompting the insurance industry to revise the basic CGL. Occurrence-based coverage was adopted, and a covered "occurrence" was defined as something not intentional or expected by the insured. In 1973, the Insurance Services Office [ISO] amended the CGL to add an exclusion to coverage....
>
> *Interpretation* at 826. The exclusion, like the ones interpreted by the 1991 "Michigan trilogy" of insurance cases (*Woodhaven, Upjohn* and *Polkow v. Citizens Ins. Co. of Am.,* 438 Mich. 174, 476 N.W.2d 382 (1991)), provided that coverage would be excluded for:

view of the temporal meaning of the *sudden and accidental* language, the standard CGL was amended by ISO." *Interpretation* at 828 (emphasis in original). The current CGL pollution exclusion language is the one at issue before this Court (*see supra* note 2). The exclusion omits the "sudden and accidental" and "into or upon land, the atmosphere ..." language that existed in the old exclusion.

Plaintiff cites to *Tufco,* 409 S.E.2d at 699, a case from the North Carolina Court of Appeals, in support of its contention that the pollution exclusion does not apply in this case. The *Tufco* court analyzed a policy coverage issue involving the new exclusion language and an underlying dispute over the alleged contamination of chickens by the defendant's use of chemicals in resurfacing a cooler. The court explained that:

> [t]he operative terms in the version of the pollution exclusion clause at issue in this case are "discharge," "dispersal," "release," and "escape." While they are not defined in the policy, the terms "discharge" and "release" are terms of art in environmental law and include "escape" by definition and "dispersal" by concept.
>
> "Discharge" is defined in the federal regulations interpreting [RCRA] as the "accidental or intentional spilling, leaking, pumping, pouring, emitting, emptying, or dumping of hazardous waste into or on any land or water." * * * "Release" is defined in [CERCLA] as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching,

> bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
>
> *Id.* (footnote omitted).

**4.** The *Tufco* Court explains that "the historical purpose of the pollution exclusion limits the scope of the exclusion to environmental damage." *Id.*

dumping, or disposing into the environment...."

*Id.* The court found that:

[b]ecause the operative policy terms "discharge," "dispersal," "release," and "escape" are environmental terms of art, the omission of the language "into or upon land, the atmosphere or any water course of body of water" in the new pollution exclusion clause is insignificant. The omission of the phrase only removes a redundancy in the language of the exclusion....

*Id.* at 699–700.[5]

The court concluded that:

[i]n light of the language of the West American policy and Tufco's reasonable belief that damages accidentally arising from its normal business activities would not be excluded, we agree that the pollution exclusion clause in the West American policy applies only to discharges into the environment and not to the non-environmental damage that led to Perdue's claim against Tufco.

*Id.* at 700.

The Seventh Circuit in *Pipefitters Welfare Educ. Fund v. Westchester Fire,* 976 F.2d 1037, 1043 (7th Cir.1992), interpreted a pollution exclusion similar to the one before this Court in the context of a situation involving the release of PCBs. An argument was made before the Court that "the term 'pollutants' does not encompass *any* release of irritants or contaminants, but rather only those releases associated with industrial emissions, waste disposal, or other pollution-generating activities." *Id.* (emphasis in original). The Court found this argument to be somewhat overstated, but that it still raised a valid point in that "[t]he terms 'irritant' and 'contaminant,' when viewed in isolation, are virtually boundless, for 'there is virtually no substance or chemical in existence' that would not irritate or damage some person or property." *Id.* (citation

omitted). Thus, the Court stated in dictum that:

[w]ithout some *limiting principle,* the pollution exclusion clause would extend far beyond its intended scope, and lead to some absurd results. To take but two simple examples, reading the clause broadly would bar coverage for bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, and for bodily injury caused by an allergic reaction to chlorine in a public pool. Although Drano and chlorine are both irritants or contaminants that cause, under certain conditions, bodily injury or property damage, one would not ordinarily characterize these events as pollution.

*Id.* (emphasis added). The Court referenced several other cases and explained that:

[t]he bond that links all these cases is plain. All involve injuries resulting from everyday activities gone slightly, but not surprisingly, awry. There is nothing that unusual about paint peeling off of a wall, asbestos particles escaping during the installation or removal of insulation, or paint drifting off the mark during a spraypainting job. A reasonable policyholder, these courts apparently believed, would not characterize such routine incidents as pollution.

*Id.* at 1044; *see also Regent Ins. Co. v. Holmes,* 835 F.Supp. 579, 582 (D.Kan.1993); *Westchester Fire Ins. Co. v. City of Pittsburgh, Kansas,* 768 F.Supp. 1463, 1470 (D.Kan.1991). The *Pipefitters* Court did not have to embrace the "limiting principle" it addressed in the matter before it, because PCBs (clearly pollutants) were at issue.

Defendants maintain that the exclusion provision applies and coverage is not extended to this matter because: (1) a "bodily injury" is alleged (2) to have occurred "[a]t or from premises" owned by plaintiff (3) involving pollutants in the form of chemicals and fumes (4) that resulted from the "discharge" of such chemicals.

Plaintiff contends that the exclusion provision does not apply in this case because the

---

5. The court noted that when the insurance industry amended the pollution exclusion in 1985, "the amendment to the pollution exclusion was intended by the insurance industry to exclude governmental clean up costs from coverage." *Id.* at 699. Thus, "[e]ven though the new pollu-

tion exclusion does omit language requiring the discharge to be 'into or upon land, the atmosphere or any water course or body of water,' [there is] no indication that the change in language was meant to expand the scope of the clause to non-environmental damage." *Id.*

exclusion requires a "discharge, dispersal, release or escape" in order for it to apply, and no such "discharge" took place in the underlying state matter here (Pl's.Br. at 10–11). In support of its position, plaintiff relies on *Lumbermens Mut. Cas. Co. v. S–W Indus., Inc.*, 23 F.3d 970 (6th Cir.1994) and on the *Tufco* decision discussed above. In *Lumbermens*, the Sixth Circuit analyzed the policy's terms, stating:

> [a] "discharge" is defined as "a flowing or issuing out." To "disperse" is defined as "to cause to breakup and go in different ways"; "to cause to become spread widely." A "release" is defined as "the act of liberating or freeing: discharge from restraint." An "escape" is defined as an "evasion of or deliverance from what confines, limits, or holds."

*Lumbermens,* 23 F.3d at 981–82 (citing *Webster's Third New International Dictionary* 644, 653, 1917, 774 (1986)).

The Court went on to indicate that:

> [t]he fumes and dust that injured Viock, it is undisputed, were confined to S–W's plant and, in fact, were confined to that portion of that plant involved in the gluing process in which Viock worked. It strains the plain meaning, and obvious intent, of the language to suggest that these fumes, as they went from the container to Viock's lungs, had somehow been "discharged, dispersed, released or escaped." Or, considering that the fumes were confined to Viock's work area, that they had been discharged into the "atmosphere," as that word is ordinarily understood.

*Lumbermens,* 23 F.3d at 982 (citation omitted).

Defendants attempt to distinguish the *Lumbermens* decision in two ways: (1) the decision is applying Ohio law and (2) the provision in question in *Lumbermens* contains language regarding discharge "into or upon land, the atmosphere ...," and therefore it is "obvious" why the Court focused on the necessity of discharge outside the plant.

Defendants' attempt to distinguish *Lumbermens,* in this Court's opinion, is misplaced. "Ohio law" was not involved in the Court's analysis with respect to the meaning of "discharge, dispersal, release or escape." The exact language that the *Lumbermens* Court interpreted is the language that this Court is focusing on in arriving at its decision. Furthermore, the fact that the policy in *Lumbermens* contained language relating to discharge "into or upon land, the atmosphere ..." is not significant. In this Court's opinion, the omission of such language does not affect the meaning of the words "discharge, dispersal, release or escape." *See Tufco,* 409 S.E.2d at 699–700 ("[t]he omission of the phrase only removes a redundancy in the language of the exclusion.").

Defendants rely significantly on the Michigan Supreme Court's decision in *Woodhaven.* In this Court's opinion, such reliance is misplaced. The Court in *Woodhaven* did not address the meaning of the words "discharge, dispersal, release or escape." Rather, the *Woodhaven* Court was focusing on the meaning of the word "pollutant." This Court agrees with defendants that applying Michigan law to the meaning of "pollutant," as set forth by the *Woodhaven* Court, leads to the conclusion that the "chemical," which allegedly caused Dittmer's injury, was a pollutant. However, Dittmer's complaint in the underlying lawsuit alleges that she was injured when she was overcome by fumes from the chemicals she was using. In this Court's opinion, Dittmer's complaint does not allege injury resulting from "discharged, dispersed, released or escaped" pollutants.

This Court adopts the reasoning of the Sixth Circuit in *Lumbermens* and the *Tufco* court. As was the case in *Lumbermens,* this Court believes that it would strain the plain meaning and obvious intent of the "discharge" language to suggest that the underlying state court plaintiff's exposure to a photo-developing chemical resulted from a "discharge, dispersal, release or escape."[6] *See Lumbermens,* 23 F.3d at 982.

---

6. Defendant does not dispute the fact that the use of chemicals in the photography lab by students was a regular and usual school activity for students enrolled in the photography class.

Furthermore, to the extent that the phrase "discharge, dispersal, release or escape of pollutants" is ambiguous, such ambiguity must be resolved in favor of plaintiff.[7] *Powers v. Detroit Auto. Inter–Ins. Exchange,* 427 Mich. 602, 624–25, 398 N.W.2d 411 (1986). The Michigan Supreme Court has explained that:

> a policy of insurance couched in language chosen by the insurer must be given the construction of which it is susceptible most favorable to the insured; ... and that exceptions in an insurance policy to the general liability provided for are to be strictly construed against the insurer.

*Pietrantonio v. Travelers, Ins. Co.,* 282 Mich. 111, 116, 275 N.W. 786 (1937) (citation omitted).

### III. Conclusion

For the reasons set forth above, the Court concludes that the pollution exclusion does not exclude coverage for the claim asserted by the plaintiff in the underlying state case, and therefore defendant has a duty to defend and indemnify plaintiff for the claims asserted by plaintiff Dittmer in the underlying lawsuit. Therefore, plaintiff's motion for summary judgment shall be granted and defendants' motion for summary judgment shall be denied.

---

**7.** It should be noted that the insurer accepted and undertook the defense of the underlying plaintiff's claim when the first lawsuit was filed, which alleged the same cause of the injury. It was not until the second lawsuit was filed over a year later that the insurer "realized" (took the position) that its policy did not cover this injury.