CENTURY INDEMNITY COMPANY, as successor to CCI Insurance Company, as successor to Insurance Company of North America, One Beacon Insurance Company, and Continental Insurance, Plaintiffs/Counterclaim–Defendants,

v.

AERO–MOTIVE COMPANY, Aero–Motive Manufacturing Company, William Becker, and Roger Becker, Defendants/Counterclaim–Plaintiffs.

No. 1:02–CV–108.

United States District Court,
W.D. Michigan,
Southern Division.

May 28, 2004.

Brian C. Coffey, William M. Cohn, Chicago, IL, Carole D. Bos, Susan Wilson Keener, Grand Rapids, MI, for plaintiffs.

David Bloss, Grand Rapids, MI, Kathleen A. McQueeny, Chicago, IL, for intervenor-plaintiff.

Eric C. Fleetham, Charles M. Denton, Matthew B. Eugster, Grand Rapids, MI, for defendants.

### OPINION

QUIST, District Judge.

This case involves a dispute regarding insurance coverage for environmental damage. The insurers (collectively "Insurers"), Century Indemnity Company ("Century"), One Beacon Insurance Company ("One Beacon"), and Continental Insurance ("Continental"), filed claims seeking declarations that they are not obligated to Defendants (collectively "Aero") under certain policies the Insurers issued and that they are not obligated to satisfy a consent judgment (the "Consent Judgment") Defendants entered into. Presently before the Court are several motions for summary judgment filed by the Insurers and Aero concerning the enforceability and effect of the Consent Judgment as well various coverage defenses under the policies. The Court will rule as follows regarding the Consent Judgment: (1) the Consent Judgment is not binding upon the Insurers; (2) the Consent Judgment does not

limit Aero II's claims against Continental or the other Insurers to $100,000—the amount paid by the Beckers; (3) Century did not breach its duty to defend, and the Beckers were not entitled to enter into the Consent Judgment; and (4) the Beckers breached their duty to cooperate with Century by entering into the Consent Judgment with Aero II, thus relieving Century of its obligations to the Beckers under its policies. The Court will rule as follows regarding the remaining motions: (1) the Beckers failed to give timely notice of Aero II's claim to Continental, although Continental has failed to demonstrate prejudice from the late notice; (2) the limits of Continental's policy for the period from July 1, 1966, to August 11, 1967, are $25,000; and (3) One Beacon has no coverage obligation to Aero II under policy AW 40089–65 for the cleanup of the contamination at the site based upon the pollution exclusion set forth in the policy.

### I. *Facts and Procedural History*

Defendant Aero–Motive Manufacturing Company ("Aero I") was formed in approximately 1939 and manufactured cable and hose reels until 1972. Defendants William Becker and Roger Becker (the "Beckers") owned and operated Aero I between 1960 and 1972. In 1972, Aero I sold its assets to Kalaco, Inc., a subsidiary of the Daniel Woodhead Company. Kalaco, Inc. later changed its name to Aero–Motive Manufacturing Company ("Aero II").

In the early 1990's, Aero II discovered contamination at the site of the Aero I manufacturing plant located on ML Avenue in Kalamazoo, Michigan (the "Property"), which Aero II had operated since 1972. Subsequent investigation revealed that contamination had migrated from the

Property to an area one mile downgradient. As a result, Aero II was required to take remedial action in response to claims by the Michigan Department of Environmental Quality and incurred costs to clean up the contamination. In August 1995, Aero II notified the Beckers of their potential liability for the contamination and cleanup costs.

Century, Continental, and One Beacon, or their predecessors, issued comprehensive general liability policies to Aero I between January 1964 and July of 1972. Century's predecessor, Insurance Company of North America ("INA"), insured Aero I from January 19, 1964, to January 19, 1965, under Policy No. LAB 16925, and from January 19, 1965, to July 1, 1965, under Policy No. LAB 16994. Continental insured Aero I from July 1, 1965, to July 1, 1968, under Policy No. CBP 40559. One Beacon's predecessor, American Employers, insured Aero I from July 1, 1968, to July 1, 1971, under Policy No. A 13 40007–31, and from July 1, 1971, to July 1, 1972, under Policy No. AD 40018–13.[1] In addition to these policies (the "Primary Policies"), Aero I had coverage from August 11, 1964, to August 11, 1973, under excess umbrella policies (the "Excess Policies") issued by INA.

In 1999, Aero II filed suit against the Beckers, alleging that the Beckers were liable to Aero II for cleanup costs (the "Becker suit"). The Beckers notified Century, Continental, and One Beacon of the lawsuit. Century agreed to fund forty percent of the Beckers' defense costs, subject to a reservation of rights.[2] In 2001, Aero II filed suit against Aero I (the "Aero I suit") for recovery of clean-up costs. Century agreed to fund all of Aero I's

---

1. Policy No. AD 40018–13 was initially issued for the period July 1, 1971 to July 1, 1974, but was cancelled on July 1, 1972, after Aero II purchased the assets of Aero I.

2. Century refers to the agreement with the Beckers as a "Non-waiver Agreement."

defense costs in that suit, subject to a reservation of rights. Continental and One Beacon refused to pay defense costs for either lawsuit.

On February 7, 2002, a settlement conference was held in the Becker suit. As of that time, neither the Beckers nor Aero II had provided the Insurers with copies of their respective Primary Policies under which the Beckers claimed coverage because the actual policies were missing. Counsel for Aero II, Aero I, the Beckers, and the Insurers were present at the settlement conference. Client representatives from Continental and One Beacon were also present.[3] During the conference, Aero II and the Beckers signed the $5 million Consent Judgment, which their counsel had previously negotiated, drafted, and finalized without notice to the Insurers. Pursuant to the terms of the Consent Judgment, the Beckers agreed to pay $100,000 to Aero II and Aero II agreed to seek the balance of the $5 million judgment from the Beckers' insurers. At the same time, Aero II and the Beckers executed a Confidential Settlement Agreement, pursuant to which the Beckers agreed to cooperate with Aero II in pursuing insurance coverage from the Insurers for the claims and damages covered by the Consent Judgment. The Confidential Settlement Agreement also contains a "reopener" which provides that the Beckers will be liable for up to an additional $50,000 if Aero II is unable to recover a specified minimum amount from the Insurers.

The Court rejected the initial draft of the Consent Judgment because it had concerns that language in the Consent Judgment could be construed as factual findings by the Court when, in fact, that was not the case. The Court was also concerned about the binding effect upon the Insurers. Thereafter, the parties made changes to the Consent Judgment, and the Court signed the revised version. The revised Consent Judgment does not contain any findings of fact such as would be found after trial or after a full review of the record upon summary judgment. Rather the "findings" were as presented to the Court by Aero and the Beckers, and even then the Court first rejected the proposed findings because there had not been a complete review of the record. The Court was familiar enough with the case, however, that it recognized that there was sufficient evidence in the record from which, after a one-sided look, the facts could be found. The Court rejected the proposed Consent Judgment until it was crystal clear that the Consent Judgment would be binding upon the parties *"only"* and "their successors, permitted assigns, heirs, privies and designees." The whole purpose for this required limitation, as has been repeatedly explained to Aero, was to avoid the very arguments that Aero is now making. The Beckers and Aero might have intended something different, of which they did not inform this Court when they submitted the Consent Judgment, but this Court knows what it signed, and what it signed should not be construed by anyone to give any advantage to Aero vis-a-vis the Insurers.

Century and One Beacon filed the instant action one day after the Court entered the Consent Judgment. Century and One Beacon sought in their complaint a declaration that they are not obligated to Aero under their respective policies and

---

**3.** Although Aero points out that Century's client representative did not attend the settlement conference, it appears that the representative had purchased a plane ticket to Grand Rapids, but the day before the settlement conference had become too ill to fly. (2/7/02 Settlement Conference Tr. at 4–5.) However, Century's counsel informed the magistrate judge that he had received settlement authority from his client.

that they are not bound by the Consent Judgment. Subsequently, Aero obtained writs of garnishment against the Insurers in order to collect on the Consent Judgment. In response, Century and One Beacon moved to stay the garnishment proceeding and to quash Aero's notices of deposition and subpoenas. Aero then moved the Court to stay this action and to allow the Insurers' liability to be determined in the garnishment proceeding. On June 26, 2002, the Court entered an Order denying Aero's motion to stay this case and granting Continental's motion to intervene as a plaintiff. On June 27, 2002, the Court entered an Order granting Century and One Beacon's motion to stay the garnishment proceeding in the Becker suit. In its June 26, 2002, Order in this case, the Court set forth discovery, motion, and briefing deadlines regarding the issue of the existence or non-existence of potential insurance coverage. Thus, the Court determined that the initial phase of this action should be limited to determining whether Aero could establish the essential terms of the lost or missing insurance policies.

During the course of this case the Court has made two significant rulings. First, in its February 18, 2003, Opinion and Order, the Court determined that Aero had presented sufficient evidence to establish the existence and terms of all of the Primary Policies except Continental Policy No. CBP 40559, for the period July 1, 1966, to July 1, 1968. By Memorandum Order dated April 4, 2003, the Court granted Aero's motion for reconsideration with regard to Continental Policy No. CBP 40559, for the period July 1, 1966, to July 1, 1968, although the Court noted that there was no evidence showing when the limits of liability were reduced from the initial $100,000 to $25,000. Second, in its December 17, 2003, Opinion and Order, the Court granted in part and denied in part Aero's motion for partial summary judgment on the

duty to defend. Among other things, the Court held that the Insurers had a duty to defend the Beckers under their Primary Policies but that the Insurers did not have a duty to defend Aero II. The Court also held that Continental and One Beacon are not liable for pre-tender defense costs and that defense costs should be allocated among the Insurers on a time-on-the-risk basis. In a subsequent Memorandum Order dated March 12, 2004, the Court granted Aero's motion for reconsideration in part, specifically with regard to the Aero II's claim that it is an insured under the last Century Excess Policy by operation of a 1972 assignment from Aero I.

## II. *Motion Standard*

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Financial Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

## III. *Discussion*

As noted above, the parties have filed several motions for summary judgment. For organizational purposes, the Court will first consider together all motions relating to the Consent Judgment. Those motions

include: (1) Aero's motion for summary judgment on the collectability of the Consent Judgment from the Insurers; (2) Aero's motion for partial summary judgment on indemnity coverage and allocation; (3) Continental's motion for partial summary judgment regarding the issue of whether the Consent Judgment limits Continental's liability to $100,000; (4) Century's motion for summary judgment with regard to the Beckers' breach of the cooperation clause; and (5) Century's motion for summary judgment with regard to the duty to defend. Second, the Court will address Continental's motion for summary judgment regarding late notice. Third, the Court will address Continental's motion for summary judgment regarding the limits of liability for property damage coverage under its policy. Finally, the Court will address One Beacon's motion for summary judgment regarding Policy No. AW 40089-65, under which Aero II is the insured, on the basis that the policy contains a "sudden and accidental" pollution exclusion.

## A. The Consent Judgment

Aero has filed two motions for partial summary judgment based upon the Consent Judgment. In the first motion, Aero contends that the Consent Judgment is valid and enforceable against the Insurers. Aero argues that the Beckers were entitled to enter into the Consent Judgment with Aero II because the Insurers had breached their duty to defend the Beckers and the settlement was neither unreasonable nor the product of bad faith. In the second motion, Aero asserts that it is entitled to collect under the Consent Judgment because the Insurers' policies provide coverage for the Beckers' environmental property damage liability.

■ Under Michigan law, an insurer has two alternatives when it determines that a claim against its insured is not covered under the policy. The insurer may repudiate liability and refuse to defend, in which case the insurer must accept the risk that its determination of no coverage was incorrect; or the insurer may protect itself by providing a defense under a reservation of rights. *Elliott v. Cas. Ass'n of Am.*, 254 Mich. 282, 286–87, 236 N.W. 782, 783 (1931); *see also Kirschner v. Process Design Assocs., Inc.*, 459 Mich. 587, 593–94, 592 N.W.2d 707, 709 (1999) (stating that "once an insurance company has denied coverage to an insured and stated its defenses, the insurance company has waived or is estopped from raising new defenses"). Where an insurer breaches its duty to defend, the insured is released from its obligation to give the insurer an opportunity to contest liability and is free to settle the claim with the third party. *Alyas v. Gillard*, 180 Mich.App. 154, 160, 446 N.W.2d 610, 613 (1989) (per curiam). In those circumstances, "the insurer is bound by any reasonable settlement entered into in good faith between the insured and the third party." *Id.* "The insurance carrier will not be permitted to benefit by sitting idly by, knowing of the litigation, and watching its insured become prejudiced." *Id.* (citing *Burgess v. Am. Fid. Fire Ins. Co.*, 107 Mich.App. 625, 630, 310 N.W.2d 23, 25 (1981)). Thus, the insurer will be bound by the settlement so long as the settlement was reasonable and was entered into in good faith. However, an insurer may avoid liability for the settlement by its insured by demonstrating that there was no liability under the policy. *Elliott*, 254 Mich. at 287, 236 N.W. at 783.

■ Aero contends that the rule set forth in *Elliott* and *Alyas* applies in this case because the Insurers breached their duty to defend. In particular, Aero cites the Court's December 17, 2003, Opinion as support for this proposition. Aero contends that because the Insurers rejected

the Beckers' request that the Insurers defend and indemnify them against Aero II's claims and because the Court has concluded that the Beckers are entitled to defense costs under the Insurer's policies, the Beckers were entitled to enter into the Consent Judgment with Aero II. Aero also contends that the $5 million amount was reasonable in light of the Beckers' potential liability for past and future environmental response costs, attorneys' fees and interest in excess of $7.2 million. Furthermore, Aero contends, the Consent Judgment was not the product of bad faith because at the time the Beckers signed it: (1) trial was approximately one month away; (2) the Court had denied the Beckers' motion for summary judgment; (3) none of the Insurers had made a commitment to indemnify the Beckers for any liability or judgment; (4) the Beckers were continuing to incur attorneys' fees, expert witness fees, and court costs, which were only partially offset by Century's revocable agreement to pay forty percent of those costs; (5) settlement negotiations based upon the Beckers' personal assets and ability to pay had failed; and (6) the Insurers had failed to communicate any settlement offer at the settlement conference.

■ The Court rejects Aero's argument because its foundational premise—breach of the duty to defend—does not exist. In other words, the Insurers had not breached their duty to defend at the time the

Beckers signed the Consent Judgment.[4] The key fact in this analysis, which Aero fails to address in any convincing manner, is that all of the policies were missing. Although the Beckers and the Insurers had attempted to locate the policies, the Insurers did not have the benefit of the policies to determine their defense and indemnity obligations to the Beckers.[5] An " 'insured bears the burden of proving coverage.' " *Heniser v. Frankenmuth Mut. Ins.*, 449 Mich. 155, 161 n. 6, 534 N.W.2d 502, 505 n. 6 (1995) (quoting *Arco Indus. Corp. v. Am. Motorists Ins. Co.*, 448 Mich. 395, 424–25, 531 N.W.2d 168, 181–82 (1995) (Boyle, J., concurring)). In addition, an insurer's duty to defend is determined by comparing the allegations of the underlying suit with the language of the insurance policy. *GAF Sales & Serv., Inc. v. Hastings Mut. Ins. Co.*, 224 Mich.App. 259, 261, 568 N.W.2d 165, 167 (1997). The contents of the policies, and hence the basis for determining whether the Insurers owed the Beckers a duty to defend, were not established until several months after the Insurers filed this action.[6] Thus, the Beckers had not even met their burden of proving coverage. The cases applying the principle upon which Aero relies refer to the insurer's refusal to defend as either being "wrongful" or "unjustified." *See Alyas*, 180 Mich.App. at 160, 446 N.W.2d at 613 (stating that the rule is applicable where the insurer "wrongfully refused to

---

4. The Insurers also point out that this Court has previously stated on numerous occasions that the Consent Judgment is not binding upon the Insurers. The Court again reiterated its position on this issue during oral argument on the instant motions. Nonetheless, the Court will address the merits of Aero's arguments presented in the instant motions.

5. While it is true that Century had located complete copies of the Excess Policies, there remained questions about whether Century had a duty to provide a defense because any defense obligation under the Excess Policies

was entirely dependant upon the coverage provided by the missing Primary Policies. Moreover, as discussed below, Century is not required to provide a defense under the Excess Policies because the Primary Policies have not been exhausted.

6. According to One Beacon, Aero II's counsel did provide a copy of Policy No. AD 40018–13 to One Beacon's counsel at the settlement conference, shortly before the Beckers and Aero II signed the pre-negotiated Consent Judgment.

defend"); Detroit Edison Co. v. Mich. Mut. Ins. Co., 102 Mich.App. 136, 144, 301 N.W.2d 832, 835 (1981) ("The general rule is that the insurer's *unjustified* refusal to defend makes it bound to pay the amount of any reasonable, good faith settlement made by the insured in the action brought against him by the injured party."). Where there is no policy or relevant policy language, there is no reasonable basis to conclude that the Insurers "unjustly" or "wrongfully refuse[d] to defend the action" when they declined to provide a defense. *Giffels v. Home Ins. Co.*, 19 Mich.App. 146, 153, 172 N.W.2d 540, 544 (1969). The cases cited by Aero in support of its argument are not to the contrary, as they did not involve circumstances where the policies were missing.

It also bears noting that this is not a case in which an insurer hung its insured out to dry by leaving the insured to shoulder the entire defense, nor is it a case where an insurer categorically denied any indemnity obligation. Given the fact that the Beckers had failed to provide either the contents of the policies or coverage details to the Insurers, the Insurers would have been justified in refusing to contribute anything to the defense or settlement. While Continental and One Beacon apparently declined to provide a defense or reimburse the Beckers for their defense costs, Century did agree to fund 40% of the Beckers' defense costs under Century's primary policies and, as this Court has already found, actually paid more than its share of those costs based upon a time-on-the-risk allocation.[7] Aero's argument is further undercut by the fact that the Insurers put together a group settlement offer on behalf of the Beckers in an amount within the settlement range assessed by the Beckers' counsel as reasonable. Therefore, for these reasons, and as

discussed further below in connection with Century's motion regarding the duty to defend, the Consent Judgment is not binding upon the Insurers.

Aero's reliance upon the Court's prior conclusion that the Insurers owe a duty to defend the Beckers under their respective policies and that the Beckers are entitled to reimbursement of their defense costs is misplaced. Contrary to Aero's suggestion, the Court did not hold that the Insurers breached their defense obligations during the pendency of the Becker suit. Rather, following its conclusion that Aero presented sufficient evidence *in this lawsuit* to establish the material terms of the policies, the Court simply held that the Insurers have a duty to defend the Beckers under the terms of those policies that have now been established.

While the foregoing discussion adequately disposes of Aero's claim regarding the binding effect of the Consent Judgment, Aero's argument also fails because the settlement was neither reasonable nor the product of good faith.

> Reasonableness is determined by looking at the amount paid in light of the risk of exposure. *Trim v. Clark Equipment Co.*, 87 Mich.App. 270, 278, 274 N.W.2d 33 (1978). Risk of exposure is the probable amount of a judgment if the plaintiff were to prevail at trial balanced against the possibility that the defendant would have prevailed. *Id.* The possibility of a defense is but one factor to consider in the determination. *Id.*

*Pioneer State Mut. Ins. Co. v. Rowley*, Nos. 179331, 181578, 1997 WL 33344874, at *4 (Mich.Ct.App. Aug. 1, 1997) (per curiam). In determining the Beckers' risk of exposure, the more telling measure is not

---

7. The Court also previously determined that Century did not have a defense obligation

under the Excess Policies that it issued to Aero I.

the risk and amount of liability Aero now claims the Beckers were facing when they negotiated and signed the Consent Judgment, but instead the parties' respective assessments of the Beckers' liability at that time. In this regard, one gauge of the risk of exposure is the $2.5 million settlement offer Aero II made to the Insurers shortly before the settlement conference.[8] (Letter from Denton to Insurers' counsel of 1/30/02, Def. Century's Ex. 29.) Notably the offer was for one-half the amount of the Consent Judgment and was more extensive in scope than the Consent Judgment, because it covered not only the Becker suit but also the Aero I suit. The Beckers' counsel's view of the value of Aero II's case against the Beckers provides another measure of the reasonableness of the Consent Judgment. The evidence shows that the $5 million consent judgment was substantially out of proportion to the value the Beckers' counsel, John Byl, placed on the case. For example, in March 2001, attorney Byl reported to Century that Aero II's view of its trial prospects was "really inflated" and that the Beckers' potential liability was between $250,000 and $300,000, based upon the cost of cleaning up the old disposal pit area. (Def. Century's Joint Ex. 13; Byl Dep. at 95, Def. Century's Joint Ex. 31.) In June 2001, Byl told Century that Aero II's earlier demand, which was less than $2.5 million, "was outrageous and not worth responding to." (Def. Century's Joint Ex. 16.) On October 17, 2001, after the Court issued its Order denying Aero II's motion for partial summary judgment and granting the Beckers' motion for summary judgment on Aero II's claims for owner liability and derivative liability under CERCLA, and Aero II's RCRA and state law claims, Byl told Century that the remaining operator liability claim would be difficult for Aero II to prove (with the right jury instructions pursuant to *United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998)) and that Aero II "should be nervous about its prospects at trial."[9] (Def. Century's Joint Exs. 14.) Byl's testimony in this case is consistent with his pre-Consent Judgment view of the Becker's liability. In his deposition, Byl conceded that he never valued the underlying case at anywhere near $5 million and

---

8. Aero contends that evidence regarding the settlement offer is inadmissible under Fed. R.Evid. 408 and is contrary to the settlement privilege recognized by the Sixth Circuit in *Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 332 F.3d 976 (6th Cir.2003). Rule 408 provides that evidence regarding an offer of "a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount." Fed.R.Evid. 408. However, the rule "does not require exclusion when the evidence is offered for another purpose." *Id.* Here, the Insurers are relying on Aero's settlement offer in the Becker suit to rebut Aero's claim that the settlement amount was reasonable. In other words, Aero has put reasonableness at issue, and settlement offer is directly relevant to that issue. Courts have admitted evidence of settlement offers or negotiations for similar purposes. For example, in *Urico v. Parnell Oil Co.*, 708 F.2d 852 (1st Cir.1983), evidence of the plaintiff's negotiations with an insurance company was held admissible to show that the insurer unreasonably prevented the plaintiffs from mitigating their damages. *Id.* at 854–55. Courts have held that evidence of settlement discussions is admissible to show an insurer's bad faith refusal to settle a claim. *See Olin v. Ins. Co. of N. Am.*, 603 F.Supp. 445, 446 (S.D.N.Y.1985); *Civic Fed. Savings Bank v. Hanover Ins. Co.*, No. 91 C 8286, 1992 WL 188409, at *2 (N.D.Ill. July 29, 1992). Similarly, in this case, evidence of settlement negotiations is admissible on the issue of reasonableness/good faith of the Consent Judgment.

9. Although the Court subsequently granted Aero II's motion for reconsideration with regard to the owner liability claim, the Court noted that the evidence supporting that claim was weak.

that the $5 million settlement figure doesn't bear any relationship to his valuation of the case. (Byl Dep. at 94, 99.) Byl also said that he never thought that the underlying case was worth more than $1 million. (*Id.* at 96.)

This evidence shows that the $5 million settlement figure is unreasonable because it is twice the amount of Aero II's highest demand (in settlement of two cases rather than one) and is roughly ten to twenty times the amount of Byl's valuation. The unreasonableness of the settlement amount is underscored by Byl's own assessment of another settlement demand of less than $2.5 million as "outrageous and not worth responding to" and his assessment of Aero II's view of its trial prospects as "really inflated." Moreover, besides being unreasonable, the Consent Judgment was the product of bad faith by the Beckers. The evidence before the Court shows that in spite of the facts that Century was funding 40% of the Beckers' defense costs and that all of the Insurers were participating in a settlement offer within Byl's assessed range of potential liability, the Beckers sought to extricate themselves from Aero II's claims by paying a modest amount to Aero II, saddling the Insurers with an unreasonable Consent Judgment, and joining forces with Aero II to enforce the Consent Judgment against the Insurers. Moreover, at no time did the Beckers or their counsel inform Century or the other Insurers of their negotiations with Aero II leading up to the settlement conference, even though the Beckers were benefiting from Century's partial reimbursement of their defense costs.

Aero has also filed a motion for partial summary judgment on indemnity coverage and allocation. This motion is an adjunct to Aero's motion for partial summary judgment on the collectability of the Consent Judgment and pertains to the rule that an insurer is not bound by a consent judgment between its insured and a third-party claimant where the insurer can demonstrate that there is no liability under the policy. Because the Court has already concluded that the Consent Judgment is not binding upon the Insurers, there is no need for the Court to address this motion. Moreover, as the Court has previously noted, there are significant disputes of material fact as to when the environmental contamination occurred. Therefore, this motion will be denied.

■ Continental has filed its own motion for partial summary judgment regarding the effect of the Consent Judgment. In this motion, Continental argues that its liability is limited to the amount the Beckers paid · under the Consent Judgment. Continental argues that the Beckers' payment of $100,000 to Aero II constituted a complete satisfaction of the Beckers' legal obligation to Aero II. Continental's argument is based upon language in its policy which provides that Continental is only obligated to pay sums which constitute a legal obligation of its insured. Continental asserts that its liability under the policy is limited to $100,000 because the Beckers' payment to Aero II constituted a satisfaction of judgment and relieved the Beckers of any further obligation under the Consent Judgment. Century has filed a joinder in the motion.

The Court will deny the motion because it is based upon a faulty interpretation of the Consent Judgment. As discussed above, Michigan law permits an insured to enter into a consent judgment with a third party to settle litigation where the insurer denies liability and wrongfully refuses to defend. In addition, Michigan courts have recognized that the parties may agree to limit collection of the judgment to specific assets of the insured. For example, in *Alyas v. Gillard*, 180 Mich.App. 154, 446 N.W.2d 610 (1989) (per curiam), one plaintiff was injured and the other plaintiff's

decedent was killed in an automobile accident caused by a patron of the defendant bar. The plaintiffs brought separate dramshop actions against the bar. Union Indemnity Insurance Company of New York was the primary insurer of the defendant, John Gillard, doing business as Eddies Bar. Gillard was also insured under an excess policy issued by Illinois Employers Insurance of Wausau. After the cases were filed, Union went into receivership, and by statute, the Michigan Property and Casualty Guarantee Association ("MPCGA") became responsible for the defense. After a default judgment was entered against the bar in one of the actions, Gillard's attorney notified Union, Wausau, and MPCGA of the claims. When Union and MPCGA refused to defend, the parties' counsel settled both cases and entered into consent judgments against the bar in each case in the amount of $150,000. The consent judgments also provided that the liability was to be satisfied solely from the proceeds of any liability insurance available to the bar and that the bar and Gillard were released from any and all liability. The plaintiffs then filed writs of garnishment, and the insurers filed motions for summary disposition, which the trial courts granted. The trial judge in one of the cases granted summary disposition on the ground that the consent judgment released the bar from personal liability and therefore the insurers could not be liable. The Michigan Court of Appeals disagreed with this conclusion:

> There is no claim that the consent judgment is not valid or binding as to plaintiff, Alyas [sic] John Gillard and the bar. At the time the judgment was entered, the bar was involved in actual litigation and was facing liability. The language of the judgment does not release Gillard or the bar. It specifically provides that the bar is liable in the amount of $150,000. The agreement limits the assets that plaintiff may pursue. If the insurers are liable to their insured up to the amount agreed upon, then plaintiff has agreed to seek satisfaction from the insurers.

*Id.* at 161–62, 446 N.W.2d at 613. Similarly, in *Clay v. American Continental Insurance Co.*, 209 Mich.App. 644, 531 N.W.2d 829 (1995) (per curiam), the court held that a consent judgment, in which the plaintiff agreed to collect the first $200,000 from the insured, Ferguson Clinic, and to seek the balance of the $1.2 million judgment only from Ferguson Clinic's insurer, did not release Ferguson Clinic from liability beyond $200,000 and therefore did not limit the insurer's liability to the $200,000 paid by Ferguson Clinic. The court found the analysis in *Alyas* controlling, but observed that "[u]nlike the consent judgment in *Alyas*, ... the consent judgment in the present case did *not* relieve Ferguson Clinic from any and all liability; instead, the covenant not to collect only required that plaintiff pursue American Continental to collect the $1,000,000 balance of the judgment." *Id.* at 649, 531 N.W.2d at 832.

Continental argues that the Consent Judgment in this case differs from the consent judgments at issue in *Alyas* and *Clay* because the Consent Judgment here provides that the Beckers would be entitled to a "Satisfaction of Judgment" upon their timely payment of $100,000 to Aer o II. Continental contends that the term "Satisfaction of Judgment" is a term of art under Michigan law which indicates that the obligation created by the judgment has been discharged. Continental's argument is based upon Section 5 of the Consent Judgment, which provides:

> 5. **Satisfaction of Judgment.** Satisfaction of the Consent Judgment by Settling Defendants [the Beckers] shall occur as follows:
>
> (a) Settling Defendants William Becker and Roger Becker, jointly and sever-

ally, shall pay Plaintiff One Hundred Thousand Dollars ($100,000.00–U.S.) within (30) days of the Effective Date of this Consent Judgment by the Court.

(b) Plaintiff may only pursue enforcement of this Consent Judgment as against Settling Defendants, in excess of the aforementioned One Hundred Thousand Dollars ($100,000.00–U.S.), from Defendants' Insurers and their successors and assigns, and Plaintiff may not seek to enforce this Consent Judgment against any other asset or income of the Settling Defendants, whether individual or joint, tangible or intangible, past, present, or future, except as expressly provided herein.

(c) Payments to Plaintiff in satisfaction of this Judgment shall be by certified or cashier's check or money order, made payable to "Aero–Motive Company," referencing this Consent Judgment case number, and delivered to Plaintiff in care of the undersigned legal counsel of record.

Section 5 says nothing about releasing the Beckers from liability beyond the $100,000 payment, as Continental suggests. Section 4 of the Consent Judgment says that the Beckers are jointly and severally liable to Aero II in the amount of $5 million. Section 5 merely describes how the judgment will be satisfied and identifies and limits the Beckers' assets that may be used to satisfy the judgment amount. Thus, Section 5, when read in its entirety, provides that the Beckers will pay the first $100,000 of the judgment in cash and that Aero II may only seek the remainder of the judgment from the Beckers' insurers. Continental's argument is based upon a technical and strained interpretation of Section 5 and ignores Section

8(f) of the Consent Judgment, which states that "[t]he headings and paragraphs of this Consent Judgment are for convenience of reference only, and are not to be considered a part hereof, and shall not limit or otherwise affect any of the terms hereof." Therefore, contrary to Continental's suggestion, this case is indistinguishable from *Alyas* and *Clay*.[10]

Century has filed two motions pertaining to the validity and/or effect of the Consent Judgment. First, Century has moved for summary judgment with regard to the issue of whether the Beckers breached their duty to cooperate with Century by entering into the Consent Judgment and Confidential Settlement Agreement with Aero II. Second, Century has moved for summary judgment with regard to the issue of whether it breached its duty to defend the Beckers under its primary and excess policies. The Court will address the duty to defend issue first because it is of central importance to the breach of the duty to cooperate issue.

■ For the reasons set forth above with regard to whether the Insurers are bound by the Consent Judgment, the Court has already concluded that Century did not breach its duty to defend the Beckers. Aero's claim that Century breached its duty to defend is undermined by several critical points. First, Aero must concede that as of the time the Beckers and Aero II entered into the Consent Judgment, neither the Beckers nor Century had located the missing Century policies and there were serious questions not only regarding coverage, but more importantly whether the primary policies existed and what terms they contained. Second, in light of those circumstances, on or about October

**10.** A "satisfaction of judgment" in the technical sense refers to a document filed with a court as proof that a judgment has been paid. *See* W.D. Mich. L.Civ.R 67.2; M.C.R. 2.620.

As the Court noted at oral argument, the Consent Judgment makes no reference to the filing of such a document.

11, 2000, Century and the Beckers entered into an agreement pursuant to which Century agreed to "40% of all reasonable and necessary defense costs" in the Becker suit "from the date [Century] received notice of [the] claim." (Def. Century's Joint Ex. 9.) Century also reserved all of its coverage defenses as well as the right to amend or modify its share of defense costs or to withdraw from participating in the defense if it later determined that there was no coverage for the claim under the policies. Finally, the Court's previous ruling that defense costs must be allocated among the Insurers, combined with Aero's concession that Century's allocated share of defense costs is only approximately 18%, means that Century was not only fulfilling, but going beyond, whatever duty to defend it had at that point.[11]

Aero contends that Century nonetheless breached its duty to defend because it did not pay 100% of the Beckers' defense costs and did not assume total control of the defense. Aero argues that Century's reimbursement after the fact is insufficient to fulfill its duty to defend because the duty to defend is a service obligation that cannot be fulfilled by partial reimbursement. These arguments ignore the fact that the agreement between Century and the Beckers was the product of good-faith negotiations amid questions concerning the existence of coverage. Aero has failed to cite any case which holds that an insurer and its insured may not agree to partial reimbursement or that an insurer breaches its duty to defend under these circumstances. In addition, Aero has failed to cite any evidence that the Beckers ever requested that Century replace the Beckers' selected counsel with another attorney instead of having Mr. Byl continue the representation and providing partial reimbursement for his services.[12]

The Court has already rejected Aero's argument that the Court's previous ruling that the Insurers have a duty to defend under their respective policies is tantamount to a finding that Century breached its duty to defend. Likewise, Aero's contention that there is no basis to apportion defense costs to the Beckers has already been addressed and rejected in the Court's prior rulings. Finally, the Court notes that Aero does not really contest Century's position that it has no duty to defend under the Excess Policies, and the Court concludes that no such obligation exists. The excess policies provide that Century only has an obligation to defend "[i]n the event that the limits of liability of the underlying insurance ... are exhausted." (Excess Policy No. XBC 60741, at 00223, Def. Century's Joint Ex. 6.) There is no duty to defend under the Excess Policies because Aero does not claim that the primary policies have been exhausted.

■ In its second motion, Century contends that it is relieved from all liability under its primary and excess policies because the Beckers breached their duty to cooperate with Century by entering into the Consent Judgment and the Confidential Settlement Agreement. Like most insurance policies, Century's policies contained a clause requiring the insured to cooperate with Century in the investigation and defense of a claim. The clause that appears in the "worksheets," which the Court previously found were evidence of the terms of the Century/INA policies, provides:

> The insured shall co-operate with the company and, upon the company's re-

---

11. Century may also seek to recover the excess fees it paid from Continental and One Beacon pursuant to its cross-claim against those parties.

12. In fact, it appears that the Beckers wished to have Byl continue representing them because of his expertise in environmental cases. (Def. Century's Joint Ex. 13.)

quest, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation, or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the occurrence.

(Worksheet at 00123, Def. Century's Joint Ex. 2.) The excess policies contained a similar provision.

■ An insured's lack of cooperation will relieve an insurer of its obligations under an insurance policy where the insurer can show that it was prejudiced by the insured's noncompliance. *Anderson v. Kemper Ins. Co.*, 128 Mich.App. 249, 253, 340 N.W.2d 87, 90 (1983) (per curiam). *See also Allen v. Cheatum*, 351 Mich. 585, 595, 88 N.W.2d 306, 311 (1958) (stating that the rule in Michigan is that "in order for an insurance company to successfully claim noncooperation of its assured as a defense ... it not only has the burden of showing such lack of cooperation but also that it was prejudicial"). The insurer bears the burden of demonstrating prejudice. *Anderson*, 128 Mich.App. at 253, 340 N.W.2d at 90. To demonstrate prejudice, an insurer must show that it has been materially injured in its ability to defend or settle the claim. *See id.* at 254, 340 N.W.2d at 90. An insurer may establish prejudice by showing that its ability to contest its liability to its insured or that its ability to contest its insured's liability to a third party has been compromised. *CPC Int'l, Inc. v. Aerojet–Gen. Corp.*, 825 F.Supp. 795, 814 (W.D.Mich.1993) (citing *Wendel v. Swanberg*, 384 Mich. 468, 479, 185 N.W.2d 348, 353 (1971)) (discussing prejudice to the insurer in the late notice context).

Century contends that the Beckers breached the cooperation clause when their counsel entered into negotiations with counsel for Aero II in January 2002, which resulted in an agreement in principle to settle the case. The evidence, which is undisputed, also shows that shortly before the settlement conference, Aero II, with the Beckers' knowledge and consent, made a $2.5 million demand on the Insurers. A few days later, the Beckers' counsel spoke with Century's counsel about the status of the case but did not advise Century that the Beckers had agreed to settle the case. Then, at the settlement conference on February 7, 2002, the Beckers and Aero II entered into the Consent Judgment. At the same time, the Beckers executed the Confidential Settlement Agreement with Aero II, which, among other things, obligates the Beckers to cooperate with Aero II in pursuit of its claims against the Insurers and obligates the Beckers to pay up to an additional $50,000 if Aero II does not recover at least $800,000 from the Insurers.

Century further argues that it has been prejudiced by the Becker's breach of their duty to cooperate in several respects. First, the Beckers entered into the Consent Judgment which attempts to impose a $5 million liability on Century, in spite of the fact that the Beckers' counsel advised Century that the case had a value of only $250,000 to $500,000 and never valued Aero II's claim against the Beckers at more than $1 million. Second, the Beckers entered into the Confidential Settlement Agreement, which obligates the Beckers to cooperate with Aero II and requires the Beckers' to pay an additional amount if Aero II does not achieve a certain level of success against the Insurers. Third, Century contends that after agreeing to cooperate with Aero II against the insurers, the Beckers changed their sworn testimony. For example, William Becker,

one of the few witnesses who worked for both Aero I and Aero II, testified in the Becker suit that attention to environmental matters "became considerably less after the acquisition" by Aero II, whereas in this case William Becker's testimony was more equivocal ("what I'm trying to tell you is that at that point in time, environmental was not a household word. It wasn't a factor in running a business"; "there really wasn't any focus on environmental before or after"). Similarly, in the Becker suit, Roger Becker testified that he knew that hazardous substances were not disposed at the site when Aero I owned it because he "was in the plant all the time" and Aero I's "people were trained to keep a clean operation." In this case, however, Roger Becker qualified this statement to "the best of his knowledge" because the Beckers "weren't there for the entire time." Roger Becker also testified in the Becker suit that Aero I disposed of liquid waste off-site during the period in question, but in this case Roger Becker testified that he could not be positive that liquid waste was hauled off-site. Finally, Century notes that after asserting in a brief in the Becker suit that there was no evidence of TCE disposal during the Aero I era, the Beckers allowed their new counsel in this case to file a brief stating that the releases that caused the contamination and property damage occurred during Aero I's operation of the site.

Aero's response is largely confined to its rejoinder that the Beckers were excused from their duty to cooperate with Century because Century failed to provide a defense, but the Court has already rejected this assertion.[13] Aero also argues that Century cannot claim that it was prejudiced by the Beckers' lack of cooperation because Century refused an invitation to participate in facilitative mediation and failed to send a client representative to the settlement conference. These arguments fail because there is no evidence that Byl or Aero II's counsel ever invited the Insurers to attend the facilitative mediation (although there is evidence showing that Century was in contact with Byl about the upcoming mediation) and Century's client representative was unable to attend the settlement conference because he was ill.

In *Giffels v. Home Insurance Co.*, 19 Mich.App. 146, 172 N.W.2d 540 (1969), the insured settled a claim without the insurer's consent. The court held that by doing so, the insured denied the insurer its right to adjust or defend the claim. *Id.* at 152–53, 172 N.W.2d at 543–44. As a result, the insurer was relieved of any liability under the policy. *Id.* at 153, 172 N.W.2d at 544. The facts of this case are even more compelling because the Beckers settled the case without Century's consent and acquiesced in Aero II's attempt to stick Century with a multi-million dollar liability even though the Beckers' own counsel assessed the Beckers' potential liability at no more than $500,000. Moreover, Century sustained substantial prejudice, namely, the Beckers' willingness to change or at least shade their prior testimony. Finally, it is inconceivable that Century could not be prejudiced by the Beckers entering into an agreement in which they not only agreed to cooperate with Aero II against the Insurers, but accepted a financial incentive to ensure that Aero II achieves a certain level of success. As Century notes, it cannot possibly mount a complete defense of its interests or the Beckers' interests now that the Beckers have changed

13. Aero's judicial estoppel argument must therefore be rejected, because there was a breach of the duty to defend in *St. Paul Insurance Co. v. Bischoff and Insurance Co. of* *North America*, Case No. 81–34511–NZ (Kent County Circuit Ct.1984), the case Aero relies upon in support of that argument, while there was no such breach here.

teams. Accordingly, Century is released from its obligations under its policies as a result of the Beckers' breach of their duty of cooperation.

### B. Continental's Motion Regarding Late Notice

■ Continental contends that it is entitled to summary judgment because the Beckers and Aero II failed to provide timely notice of the claim to Continental. Continental's policy contains a notice provision which states:

> If a claim is made or suit is brought against the insured, the insured shall immediately forward to the Company every demand, notice, summons or other process received by him or his representative.

Michigan courts have held that where the insured is required to give notice "immediately" or "as soon as practicable," notice must be given "within a reasonable time." *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 10 F.Supp.2d 800, 808 (E.D.Mich.1998). The requirement of timely notice allows the insurer "an opportunity to investigate the facts and circumstances affecting the question of liability and the extent of such liability." *Wehner v. Foster*, 331 Mich. 113, 119, 49 N.W.2d 87, 90 (1951). Delay in giving notice is not a ground for excusing an insurer from performing its obligations under a policy. *Wendel v. Swanberg*, 384 Mich. 468, 478, 185 N.W.2d 348, 353 (1971). Instead, an insurer will not be relieved of it obligations to the insured unless the insurer can show that it has been prejudiced by the delay. *West Bay Exploration Co. v. AIG Specialty Agencies of Texas, Inc.*, 915 F.2d 1030, 1036 (6th Cir.1990). Prejudice may not be presumed. *Aetna Cas. & Sur. Co.*, 10 F.Supp.2d at 812. It is incumbent upon the insurer to demonstrate actual prejudice resulting from the insured's delay. *Upjohn Co. v. Aetna Cas. & Sur. Co.*, 768 F.Supp. 1186, 1202 (W.D.Mich.1990). In determining whether an insurer has been prejudiced, a court may consider "whether the delay has materially impaired the insurer's ability: (1) to investigate liability and damage issues; (2) to evaluate, negotiate, defend, or settle a claim or suit; (3) to pursue claims against third parties; (4) to contest the liability of the insured to a third party; and (4)(sic) to contest its liability to the insured." *Aetna Cas. & Sur. Co.*, 10 F.Supp.2d at 813.

■ In 1991, Aero II excavated the underground storage tank ("UST") it had installed at the site in 1974. At that time it was discovered that the tank had leaked significant amounts of TCE which Aero II had used in its degreasing operations. Following this discovery, Aero retained DeLisle Associates, Ltd., an environmental remediation contractor. By 1992, 675 cubic yards of TCE-contaminated soil excavated from the UST site had been shipped to an off-site waste facility. In 1994, Aero II broadened its site investigation to include a disposal pit which was opened in 1967. On August 31, 1995, Aero II informed the Beckers that they were liable for the costs incurred to investigate and remediate contamination at the site. By 1998, most of the major work events for remediation of the site had been completed. On May 21, 1999, Aero II filed suit against the Beckers. On July 14, 1999, Byl wrote to Century to notify it of the lawsuit:

> Because the Beckers do not have access to all the former corporate files, the Beckers do not have specific policy numbers available. Please be advised, however, that Mr. Roger Becker, the president of Aero–Motive Manufacturing Company from 1964–1972, recalls that Reliance and INA (now part of Cigna) were the general liability carriers during that time frame.

(Letter from Byl to Century of 7/14/99, Defs.' Resp. Br. Ex. F.) Byl also requested that Century review its records to obtain information regarding Aero I's insurance policies from 1964 to 1972. On November 12, 1999, Century sent Byl a copy of excess policy XBC 5224, which referred to Continental Insurance Company Policy No. CBP 40559 as the primary policy.

On December 16, 1999, Byl notified Continental of the lawsuit against the Beckers and requested a defense and indemnity. On June 15, 2000, Continental informed Byl that it could not locate the policy and therefore had no reason to believe that it existed or provided coverage for the claim. However, Continental stated that it would defer making a coverage determination until such time as the Beckers furnished evidence of the existence and terms of the missing policy. The Beckers failed to provide any additional proof to Continental, and Continental did not participate in discovery proceedings in the Becker suit. Aero II provided notice of the Becker suit to Continental on March 22, 2001.

Continental contends that it has no indemnity obligation under its policy because the Beckers and Aero II failed to provide timely notice. Continental argues that the Beckers' notice was four years late, because the Beckers should have provided notice in 1995, when Aero II informed them of its claim that the Beckers were responsible for investigation and remediation costs. Likewise, Continental argues that Aero II's notice was late because it should have provided notice in 1991, when the UST was excavated. Continental also asserts that it was prejudiced by the late notice. In particular, Continental asserts that the late notice deprived it of the opportunities to: (1) participate in the remediation process, including investigating the disposal pit and negotiating the amounts spent or steps taken to remediate the site; (2) review equipment and components at the site used in Aero II's degreas-

ing operations, including the UST, for purposes of defending against Aero II's claims as well as for a possible product liability action against the tank manufacturer; (3) analyze the contaminated surface and subsurface soils, which were excavated and shipped off-site in the early 1990s; and (4) interview or depose several individuals having knowledge about waste disposal practices who are now deceased.

Continental's argument regarding notice from Aero II fails, because it is undisputed that Aero II was not an insured under Continental's policy. Therefore, Aero II could not have breached a duty to provide notice to Continental. With regard to notice from the Beckers, the Court agrees with Continental that it was late. Continental says that the Beckers should have provided notice in 1995, when Aero II informed the Beckers of its claim against them. The Beckers respond that at that time they were long gone from Aero II, did not have the insurance policies or other records, and did not have access to Aero II's records. The Beckers point out that shortly after they were served with the complaint, their attorney located Tom Bloom, who was an agent in the then-defunct insurance agency that had handled Aero I's insurance. Bloom informed Byl that most of the clients of that agency had coverage either through Reliance or INA (Century). Byl then notified Century, and Century provided him with the information that led to Continental. Also, according to Byl's letter, Roger Becker recalled that INA provided the insurance during the time in question. Aero contends that the case is similar to *Rogers v. Great Northern Life Insurance Co.*, 284 Mich. 660, 279 N.W. 906 (1938), where the court held that a wife's notice to the insurance company a year after her husband's death was not unreasonable where she did not know that the husband had purchased the policy with the defendant or that he was insured, and

she found no policy after a diligent search. The problem with this argument is that the Beckers were the highest ranking officers of Aero I and knew that Aero I had insurance. In addition, Byl's letter to Century indicates that Roger Becker recalled that the insurer was INA. There is no reason why the Beckers could not have conducted an investigation and learned of Continental in 1995 or 1996. In fact, their memories would have been better or more accurate at that time. Therefore, the Beckers have failed to show that it was not reasonably possible for them to give notice to Continental at an earlier time.

In spite of late notice, the Court will deny the motion for lack of prejudice. Aero contends that the motion should be denied because Continental did not do anything to participate in the case after it received notice from the Beckers. Continental says that it did not fail to respond—it points out that its personnel and attorneys attempted to search for the policy, sought information from Byl regarding Aero II's claims and background information, and conducted a coverage analysis. There are several problems with Continental's argument. First, even though Continental did take some action to try to locate the policy, it ultimately denied coverage because the Beckers could not produce any evidence of the policy. In spite of its claim of prejudice, Continental has not shown that it would have proceeded differently had the Beckers provided notice in late 1995. That is, presumably, the same circumstances would have existed, and Continental would have likely denied coverage for lack of a policy. Thus, there is no reason to believe that Continental would have proceeded differently. Second, Continental's prejudice argument must be rejected because Continental has not shown that any of the lost or destroyed evidence or deceased witnesses would have been available to Continental even if the Beckers had notified Continental in 1995. For

example, according to Continental, the contaminated soil and UST were removed from the site by 1992, three years before Aero II notified the Beckers of their alleged liability. Similarly, it appears that all of the deceased witnesses identified by Continental died in the late 1980s, long before the Beckers learned of Aero II's claim. Thus, Continental has not adequately shown that the late notice affected its ability to either contest the Beckers' liability to Aero II or to contest its liability to the Beckers.

## C. Continental's Motion Regarding Limits of Liability

■ Continental has filed a motion for summary judgment regarding the coverage limits of its policy for the period July 1, 1966, through August 11, 1967. In its Opinion regarding summary judgment on the lost policy issue, the Court held that Continental's policy provided $100,000 of property damage coverage from July 1, 1965, through July 1, 1966. The Court held that Continental was entitled to summary judgment on the remainder of the policy period because Aero failed to present any evidence showing when the limits of liability were reduced from $100,000 to $25,000, or when the policy changed from accident-based to occurrence-based coverage. On reconsideration, the Court altered its decision and held that Aero was entitled to summary judgment with regard to the period of August 11, 1967, to July 1, 1968, because Aero's evidence showed that the limits of liability were $25,000 during that period. With regard to the period of July 1, 1966, through August 11, 1967—the period in question in the instant motion—the Court stated:

> The change in limits of liability presents a different situation because, as Defendants note, there is no uncertainty that the policy provided coverage with limits of at least $25,000 for the period be-

tween July 1, 1966, and August 11, 1967, but there is no evidence to show when the limits were reduced from the initial $100,000 to $25,000. However, the Court agrees with Defendants that this uncertainty should not preclude coverage, but should only limit Defendants to indemnity of $25,000 rather than $100,000 if the finder of fact concludes that Defendants have failed to establish that the limits of liability remained at $100,000 during the period in question. (4/4/03 Op. at 4.) Continental argues that the Court should grant it summary judgment with regard to the limits of liability during the period in question and hold that they were $25,000, because discovery has closed and Aero has failed to present any evidence showing when the limits were reduced to $25,000.

The Court concludes that Continental is entitled to summary judgment because Aero has failed to present any competent evidence showing when the liability limit of Continental's policy was reduced from $100,000 to $25,000. In the absence of such evidence, there is no basis for the finder of fact to determine the issue without relying upon pure speculation. Thus, Aero cannot meet its burden of proof on this issue.

The grounds Aero raises in response to Continental's motion are easily rejected. First, Aero contends that the Court has already determined that this is an issue of fact for the jury. While it is true that the Court indicated that this may be an issue for the finder of fact to decide, that observation was made at a fairly early stage in this case when discovery was still open and there was a possibility that Aero would develop additional evidence on that issue. Discovery is now closed, and Aero has failed to offer any additional evidence tending to show when the liability limit was reduced. Second, Aero points to language in the Continental form which states: "Such aggregate limits shall apply separately to each of the three consecutive annual periods comprising the policy period." Aero contends that absent evidence to the contrary, this language establishes that initial $100,000 limit continued throughout the policy term. This argument must be rejected because the policy language Aero cites relates to operations performed away from premises owned by the insured, and here the operations giving rise to the Beckers' alleged liability were performed on the insured's premises. In addition, Aero's argument ignores the Court's prior determination that the limit did in fact change at some point prior to August 11, 1967. Third, Aero contends that the policy premiums were the same for each policy year, indicating that the coverage limits would have likely been the same. Aero also cites an insurance treatise for the proposition that it is standard industry practice for an insured to purchase a three-year policy and lock in premiums and policy terms, including limits, for that period. Again, this argument ignores the Court's prior determination that the liability limit was reduced at some point after the initial policy year. Finally, Aero's reliance on the presumption for renewal policies, which the Court applied in its February 18, 2003, Opinion with regard to the One Beacon policies is misplaced because Continental's policy was not a renewal, but, instead, was a single policy with a three-year term.

### D. One Beacon's Motion for Partial Summary Judgment

One Beacon seeks partial summary judgment regarding its liability to Aero II under Policy AW 40089–65 based upon a "sudden and accidental" pollution exclusion which excludes coverage for the contamination caused by Aero II. Unlike the other policies at issue in this case, Aero II is the insured under Policy AW 40089–65. Aero

II notified One Beacon of its potential liability for the cleanup of the site in August 1995, but it did not provide any policy materials to One Beacon until March 2000. There is no dispute that Policy AW 40089–65 contains a pollution exclusion.

One Beacon contends that it is entitled to partial summary judgment with regard to Policy AW 440089–65 based upon the Court's previous rulings in *Aero–Motive Company v. Great American Insurance, f/k/a American National Fire Insurance Company*, Case No. 1:03–CV–55. In the *Great American* case, Aero II sought insurance coverage under a policy issued by Great American for the cleanup of the site at issue in this case. The Great American policy contained a "sudden and accidental" pollution exclusion that was similar to the exclusion at issue in One Beacon's policy. On August 11, 2003, the Court entered an Opinion and Order granting in part and denying in part Great American's motion for summary judgment. The Court granted the motion with respect to Aero II's claims regarding fires in the disposal pit, the degreaser, and the factory addition. The Court denied the motion with respect to Aero II's claim regarding the UST. Finally, the Court deferred a final ruling on the claim regarding dumping in the disposal pit to allow the parties an opportunity to submit additional briefing. Subsequently, in an Opinion and Order issued on November 7, 2003, the Court granted summary judgment to Great American with regard to dumping in the disposal pit and denied Aero II's motion for reconsideration. Thus, the only remaining issue was whether the Great American policy provided coverage for contamination caused by the leaking UST.[14]

The Court agrees with One Beacon that it is entitled to partial summary judgment for the same reasons that Great American was entitled to partial summary judgment based upon the "sudden and accidental" pollution exclusion. With the exception of the policy periods, both cases involve the same facts and evidence. In its response, Aero II cites the same evidence and raises the same arguments as it did in the *Great American* case. Essentially, Aero II asserts that the Court's rulings in the *Great American* case were wrong and that the Court should reconsider them. The Court concludes that its decisions were not wrong and finds no reason to reconsider them. Therefore, One Beacon is entitled to summary judgment with respect to all claims.[15]

Aero II contends that it is entitled to summary judgment with respect to the issue of defense costs because its claims are "arguably entitled to coverage," even if the Court determines that One Beacon is not liable for indemnification under the subject policy. Aero II made a similar motion for summary judgment with regard to defense costs in the *Great American* case. The Court declined to decide the issue because Aero II raised it in its response brief rather than by way of a separate motion and Great American did not submit any briefing on the issue.

It is a well-accepted principle of Michigan law that the duty to defend is broader than the duty to indemnify. *See Auto–Owners Ins. Co. v. City of Clare*, 446 Mich. 1, 15, 521 N.W.2d 480, 487 (1994); *Polkow v. Citizens Ins. Co. of Am.*, 438 Mich. 174, 180, 476 N.W.2d 382, 384 (1991). An insurer's duty to provide a defense extends to allegations that even arguably may

---

**14.** The UST claim is the subject of a pending motion for summary judgment by Great American.

**15.** The UST is not an issue for One Beacon because it was installed in 1972, after coverage under Policy AW 40089–65 had terminated.

come within the policy coverage, and "any doubt pertaining to application of the duty to defend is to be resolved in favor of the insured." *Id.* Furthermore, an insurer's duty to defend continues until there has been sufficient factual development for a determination that the environmental property damage at issue was not the result of a "sudden and accidental" release:

> Fairness requires that there be a duty to defend in environmental claims at least until there is sufficient factual development to determine what caused the pollution so that a determination can be made regarding whether the discharge was sudden and accidental. Until that time, the allegations must be seen as arguably within the comprehensive liability policy, resulting in a duty to defend.

*American Bumper & Mfg. Co. v. Hartford Fire Ins. Co.,* 452 Mich. 440, 452, 550 N.W.2d 475, 481 (1996).

 Aero II contends that One Beacon had a duty to defend at least until the conclusion of discovery in this case because the Michigan Department of Environmental Quality's ("MDEQ") claims against Aero II were arguably entitled to coverage and One Beacon did not have sufficient information available to it until the close of discovery in this case to determine whether the releases were not "sudden and accidental." Aero II asserts that because those claims were arguably within the policy's coverage, Aero II is entitled to recover all defense costs it incurred in responding to MDEQ's claims.

In *Polkow v. Citizens Insurance Co.,* 438 Mich. 174, 476 N.W.2d 382 (1991), the Michigan Supreme Court held that even where an insurance policy contains a "sudden and accidental" pollution exclusion, an insurer is required to provide a defense to the insured until there is sufficient factual development to determine whether the cause of the pollution falls within the "sud-

den and accidental" exception to the pollution exclusion. *Id.* at 180, 476 N.W.2d at 384. The decision was based upon the factual state of the record. While there was evidence from the insured that could have supported a finding that the insured "expected" the release of contaminants, there was other evidence suggesting that the contamination was not caused by the insured's releases and could have resulted from a source unrelated to the insured's operations. *Id.* at 178–79, 476 N.W.2d at 384. The court held that summary disposition was improper in light of the factual dispute regarding the cause of the contamination. Subsequently, in *American Bumper and Manufacturing Co. v. Hartford Fire Insurance Co.,* 452 Mich. 440, 550 N.W.2d 475 (1996), the Michigan Supreme Court, following *Polkow,* held that insurers were required to defend their insured in response to an Environmental Protection Agency ("EPA") claim until the EPA issued a "no action" record of decision. Several of the insurers argued that they had no duty to defend because their policies contained pollution exclusions and the EPA's claims focused upon the insured's intentional dumping of wastewater into the insured's seepage lagoon. The court rejected the argument because during the investigation period until the issuance of the "no action" decision, it was not clear whether there was an "occurrence" under the policy because it had not been determined that the insured had caused any property damage that it neither expected nor intended. *Id.* at 453–54, 550 N.W.2d at 482. In addition, questions remained regarding the cause and source of the possible contamination. *Id.* at 454, 550 N.W.2d at 482. Although it was ultimately determined that there was no occurrence under the policy, the insurers had a duty to defend until the "no action" decision was issued and the uncertainty resolved. The court observed: "By that time, it was too

late for the insurers to complain that they did not owe a duty to defend. The defense had fully run its course, exonerating [the insured] of the EPA's claims." *Id.* at 455, 550 N.W.2d at 483.

The Court rejects Aero II's argument because the circumstances in this case differ significantly from those in *Polkow* and *American Bumper.* In both of those cases, the insureds provided notice to the insurers in the early stages of the claims at issue, and there were substantial questions about whether the insured was responsible for an unexpected or unintended release that caused property damage. In contrast, here, the contamination was discovered in 1991, but Aero II did not notify One Beacon of Aero II's liability for the cleanup until August 1995, after a substantial amount of the defense costs for which Aero II now seeks reimbursement had been incurred. Aero II did not provide a copy of Policy AW 440089 to One Beacon, and One Beacon accordingly limited its investigation to a search for the policy. Neither party could locate the policy, and there remained questions about its existence and terms, if it did exist. Thus, for the reasons discussed above with regard to the Aero I policies, One Beacon was not bound to provide a defense at that time to Aero II.[16] Aero II did not provide any policy materials to One Beacon until March 6, 2000, which included some limited portions of Policy AW 440089-65. On October 8, 2003, more than one and one-half years after this case was filed and shortly before the Court issued its second Opinion and Order in the *Great American* case, Aero II produced a more complete and legible copy of the policy, which revealed that the policy in fact contained a pollution exclusion.

Given these circumstances, there is no legally supportable basis for this Court to hold that One Beacon is liable for all of Aero II's defense costs incurred prior to either the close of discovery in this case or the issuance of the Opinions and Orders in the *Great American* case. Even if there were serious questions about whether any release by Aero II was "sudden and accidental," by waiting until August 1995 to notify One Beacon of its liability for the cleanup and by failing to provide a more complete copy of the policy to One Beacon until October 2003, Aero II effectively precluded One Beacon from seeking an early determination in a declaratory judgment action of its defense obligations based upon the pollution exclusion. In other words, it would be unfair to hold, as Aero II requests, that One Beacon is liable for all of Aero II's defense costs, even though Aero II failed to provide, until late in the game, sufficient materials to establish the existence of the policy. Accordingly, One Beacon is not liable for Aero II's defense costs. *See Auto–Owners Ins. Co. v. City of Clare,* 446 Mich. 1,15–16, 521 N.W.2d 480, 487 (1994) (finding no duty to defend where the claims at issue were not within the "sudden and accidental" exception to the pollution exclusion); *Cello–Foil Prods., Inc. v. Mich. Mut. Liab. Co.,* No. 151615, 1995 WL 854728, at *2–3 (Mich.App. Aug. 15, 1995) (per curiam) (holding that the insurers had no obligation to defend or indemnify because the release of pollutants was not sudden and accidental).

### E. Motion to Exclude Testimony of Ellis R. Mirsky

Aero has filed a motion to strike the affidavit and exclude the expert testimony of Century's expert witness, Ellis R. Mir-

---

**16.** Consistent with the Court's ruling on defense costs in its December 17, 2003, Opinion and Order, Aero II would be entitled to defense costs incurred after the date Aero II gave notice to One Beacon and not prior to that time.

sky. Century retained Mr. Mirsky to testify with regard to its defense that the Beckers breached their duty to cooperate with Century. Because the Court has already concluded that Century is entitled to summary judgment on its claim that the Beckers breached the cooperation clause in Century's policies, it is unnecessary for the Court to decide this motion. Therefore, the Court will deny it as moot.

### IV. *Conclusion*

For the foregoing reasons, the Court will: (1) deny Aero's motions for partial summary judgment on the collectability of the Consent Judgment from the Insurers and on indemnity coverage and allocation; (2) deny Continental's motion for partial summary judgment with regard to the effect of the Consent Judgment upon Continental's liability under its policy; (3) grant Century's motion for partial summary judgment with regard to the duty to defend; (4) grant Century's motion for partial summary judgment with regard to the Beckers' breach of the cooperation clause; (5) deny Continental's motion for summary judgment as to late notice; (6) grant Continental's counter motion for summary judgment with regard to the limits of liability for the period from July 1, 1966, to August 11, 1967; (7) grant One Beacon's motion for partial summary judgment based upon the pollution exclusion; and (8) deny as moot Aero's motion to strike the affidavit and exclude the expert testimony of Ellis R. Mirsky.

An Order consistent with this Opinion will be entered.